459 So.2d 520 (1984)
LOUISIANA STATE BAR ASSOCIATION
v.
Ronald P. WHITTINGTON.
No. 83-B-2479.
Supreme Court of Louisiana.
November 26, 1984.
Rehearing Denied January 24, 1985.
*521 Thomas O. Collins, Jr., Wood Brown, III, New Orleans, Robert J. Boudreau, Lake Charles, Sam J. D'Amico, Baton Rouge, Carrick R. Inabnett, Monroe, Harold J. Lamy, New Orleans, Alfred S. Landry, New Iberia, Phillippi P. St. Pee', Metairie, Roland J. Achee, Shreveport, Gerald F. Thomas, Natchitoches, for applicant.
Ronald P. Whittington, St. Rose, for respondent.
Donald P. Abaunza, New Orleans, Commissioner.
MARCUS, Justice.
The Louisiana State Bar Association, through its Committee on Professional Responsibility, instituted this disciplinary proceeding against Ronald P. Whittington, a member of said association. The committee had previously conducted an investigation of respondent's alleged misconduct in accordance with article 15, section 3 of the articles of incorporation of the association. Notice of two separate specifications of misconduct was given to respondent in a communication from the committee dated April 19, 1983.
Specification No. 1 alleged:
In 1981, you were retained by Loyola University to collect certain delinquent accounts on their behalf and, did, in fact, collect monies due and owing the University. That, despite repeated requests, you failed, refused and neglected to turnover to the University funds collected in the sum of $5,586.82, and did comingle (sic) and convert said funds to your own use; all in violation of Disciplinary Rule 1-102 and 9-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.[1]
Specification No. 2 alleged:

*522 In order to provide security for funds wrongfully retained by you, as set forth in Specification number 1 above, you did sign a promissory note in favor of said University. Despite repeated demands, you failed to pay installment payments on said note when due and, as further evidence of your commingling and conversion of funds due the University, you attempted payment on the above described note with an NSF check in the sum of $504.00 on September 27, 1982, and failed, refused and neglected to make said check good, despite repeated requests; all in violation of Disciplinary Rule 1-102 and 9-102 of the Canons of Professional Responsibility for the Louisiana State Bar Association.[2]
A formal investigatory hearing was held on May 20, 1983, as provided by article 15, section 3(b) of the articles of incorporation. Respondent was present and represented himself at the hearing and testified on his own behalf.
Based on the evidence adduced at the formal investigatory hearing, the committee, by majority vote, was of the opinion that respondent had been guilty of a violation of the laws of this state relating to the professional conduct of lawyers and to the practice of law of sufficient gravity as to evidence a lack of fitness for the practice of law; that, specifically, respondent was guilty of the misconduct set forth in Specifications Nos. 1 and 2. On December 7, 1983, the committee instituted in this court a suit for disciplinary action against respondent under the provisions of article 15, section 4(c) of the articles of incorporation. Respondent filed an answer to the petition. Thereafter on motion by the committee, we appointed Donald R. Abaunza commissioner to take evidence and to report to this court his findings of fact and conclusions of law. Louisiana State Bar Association Articles of Incorporation, article 15, section 6(b) and (d).
A hearing before the commissioner was conducted on April 12, 1984. Respondent appeared at the hearing without counsel. The committee introduced in evidence, over respondent's objection, the entire record of the earlier investigatory hearing. Upon termination of the hearing, the commissioner filed with this court his written report wherein he stated his findings of fact and conclusions of law and submitted the matter for this court's determination. The committee concurred in the commissioner's findings of fact and law, but opposed the commissioner's conclusion that the committee had not proven conversion of Loyola's funds by clear and convincing evidence. Respondent filed neither concurrence nor opposition to the report of the commissioner. After oral argument before this court, the matter was submitted for our determination on the record before the commissioner.
Respondent was retained in 1979 by C.U.A., Inc. (CUA) to act as attorney in the collection of various delinquent student loan accounts for Loyola University. Respondent was paid a monthly retainer fee by CUA and received attorney fees on the accounts collected by him. Respondent provided periodic accountings to CUA of the status of the Loyola accounts, and CUA sent monthly invoices to Loyola. In mid-1981, Loyola became aware that CUA was not issuing the monthly invoices and had not turned over funds collected on Loyola accounts. Loyola terminated its relationship with CUA and asked respondent to work directly for the university in collecting the delinquent accounts. Respondent continued to handle the files he had been assigned by CUA, yet he did not institute a practice of accounting to Loyola for funds collected nor of forwarding these funds to the client.
*523 In February of 1982, Loyola learned from a former student whose file was considered delinquent that she had in fact paid $700 to respondent. Loyola thereafter made verbal demand on respondent for an accounting and for payment of monies he had collected on its accounts. Written demand was made April 15, 1982, and when respondent still did not comply, Loyola hired counsel to assist it in obtaining payment and an accounting. Respondent testified that he did not comply with Loyola's demands because both Loyola and CUA owed him fees for his collection services. He contended that he was unable to calculate these fees because certain accounts had been paid directly to Loyola or CUA and Loyola would not provide him with information on these accounts. Loyola, however, denied that it had received any direct payments on accounts turned over to respondent for collection and respondent offered no evidence to support his contention. In late June, he delivered to Loyola all files relating to its accounts. Loyola reviewed the files and after deducting court costs and attorney fees from the amount collected, made written demand on respondent on July 22, 1982 for the sum of $4,804.22.
In September of 1982, Loyola and respondent negotiated an agreement whereby respondent was to pay the amount due in installments. He presented Loyola with a check in the amount of $504.22 and a promissory note in the amount of $4,300 secured by a mortgage on his home. Both the note and mortgage were drafted by respondent and evidenced an unconditional promise to pay a debt. Respondent received notice on October 7, 1982 that the check had been returned for insufficient funds. In response to a letter from Loyola's counsel demanding payment of the check, respondent replaced it with a cashier's check on November 4, 1982. The first installment payment on the note, due October 27, 1982, was not made and Loyola's counsel recorded the mortgage the next day and filed suit to foreclose by executory process. After receiving notice of the date his home was to be sold by the sheriff, respondent tendered a check to Loyola on December 7, 1982 in the amount of $5,863.99, representing principal, interest and attorney fees as provided for in the note, together with court costs.
Although respondent maintained a client "trust account," he did not deposit the funds collected for Loyola into that account because he feared the Internal Revenue Service would levy his bank accounts for back taxes he allegedly owed.[3] Respondent contended that he converted Loyola's funds into cash and placed them in an envelope inside a black box which he held first in his office and later in his home. Loyola was not informed of this practice and respondent kept no documentation of the total amount of cash he held on Loyola's behalf. Each individual file contained notes reflecting the amount of cash held, as well as court costs and fees. Respondent testified that he kept his own cash in the black box in a separate envelope. He claimed that when he ultimately paid the balance due on the note in December of 1982 he used the funds that he had retained in the black box since he received them. Respondent offered no evidence to substantiate his assertion that he continuously held Loyola's funds in cash in a black box until he turned them over in December of 1982. The record reflects that while four previous complaints have been registered against respondent with the committee, none of these involved charges of theft or dishonesty and none resulted in disciplinary action.
The bar association has the burden of establishing by clear and convincing evidence that respondent was guilty of the alleged specifications of misconduct. Louisiana State Bar Association v. Martin, 451 So.2d 561 (La.1984); Louisiana State Bar Association v. Dowd, 445 So.2d 723 (La.1984).
Respondent's failure to place Loyola's funds in an identifiable bank account constituted *524 a violation of DR 9-102(A). When he finally attempted to transfer the amount he owed to Loyola, he presented a check which was returned for insufficient funds and a promissory note. He subsequently failed to make payment on this note. If the funds had in fact been held in cash in the black box throughout respondent's dealings with Loyola, he would have been able to pay the amount owed in cash rather than issuing an NSF check and a promissory note. Considering these facts together with his lack of documentation of the amount of cash held and his admission that his own cash was kept in the black box, we find clear and convincing proof that respondent commingled his client's funds and converted them to his own use in violation of DR 1-102 and DR 9-102.[4]
Additionally, respondent's failure to account to Loyola and notify it of his receipt of funds collected on its behalf constituted violations of DR 9-102(B)(1) and DR 9-102(B)(3). The record further reflects that respondent violated DR 9-102(B)(4) by failing, despite repeated demands, to promptly turn over his client's funds. While respondent averred that he delayed payment only to secure his fee, we cannot condone such a practice in view of the requirement in DR 9-102(B)(4) that a lawyer promptly remit funds "which the client is entitled to receive."
The purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer but rather to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession and to deter other lawyers from engaging in violations of the Code of Professional Responsibility. The discipline to be imposed will depend upon the seriousness of the offense involved and the facts and circumstances of each case. The court will take into account both aggravating and mitigating circumstances. Louisiana State Bar Association v. Martin, supra; Louisiana State Bar Association v. Dowd, supra.
We consider that the violations found herein are of sufficient gravity to warrant disciplinary action. Respondent has made full restitution to Loyola for the withheld funds, and although complaints have been made against respondent to the committee, none have resulted in disciplinary action. Under the circumstances, we do not feel that respondent should be disbarred but rather he should be suspended from the practice of law for an appropriate period of time. The commissioner recommended a suspension from the practice of law for 24 to 36 months and the committee concurred. We consider suspension from the practice of law for a period of two years as an appropriate penalty.

DECREE
For the reasons assigned, it is ordered, ajudged and decreed that Ronald P. Whittington be suspended from the practice of law in the State of Louisiana for the period of two years. Respondent is to bear all costs of these proceedings.
LEMMON, J., concurs, but would place the burden of proof on an attorney who does not use a trust fund to prove that he did not commingle his client's funds or convert to his own use.
DIXON, C.J., dissents with reasons.
DIXON, Chief Justice (dissenting).
I respectfully dissent.
When a lawyer embezzles his client's fund without mitigating circumstances, he should be disbarred. Here, respondent's "black box" defense is a continuing demonstration of basic dishonesty from which the public should be protected.
NOTES
[1] DR 1-102. Misconduct.

(A) A lawyer shall not:
(1) Violate a Disciplinary Rule.
(2) Circumvent a Disciplinary Rule through actions of another.
(3) Engage in illegal conduct involving moral turpitude.
(4) Engage in conduct involving dishonesty, fraud, deceit, or misrepresentation.
(5) Engage in conduct that is prejudicial to the administration of justice.
(6) Engage in any other conduct that adversely reflects on his fitness to practice law.
DR 9-102. Preserving Identity of Funds and Property of a Client.
(A) All funds of clients paid to a lawyer or law firm, other than advances for costs and expenses, shall be deposited in one or more identifiable bank accounts maintained in the state in which the law office is situated and no funds belonging to the lawyer or law firm shall be deposited therein except as follows:
(1) Funds reasonably sufficient to pay bank charges may be deposited therein.
(2) Funds belonging in part to a client and in part presently or potentially to the lawyer or law firm must be deposited therein, but the portion belonging to the lawyer or law firm may be withdrawn when due unless the right of the lawyer or law firm to receive it is disputed by the client, in which event the disputed portion shall not be withdrawn until the dispute is finally resolved.
(B) A lawyer shall:
(1) Promptly notify a client of the receipt of his funds, securities, or other properties.
(2) Identify and label securities and properties of a client promptly upon receipt and place them in a safe deposit box or other place of safekeeping as soon as practicable.
(3) Maintain complete records of all funds, securities, and other properties of a client coming into the possession of the lawyer and render appropriate accounts to his client regarding them.
(4) Promptly pay or deliver to the client as requested by a client the funds, securities, or other properties in the possession of the lawyer which the client is entitled to receive.
[2] See footnote 1 above.
[3] The IRS did in fact levy respondent's bank accounts on September 15, 1981.
[4] This finding conflicts with the conclusion of fact by the commissioner, opposed by the committee, that the committee did not prove by clear and convincing evidence that respondent converted Loyola's funds.