LPER CURIAM.*
In this matter, the Office of Disciplinary Counsel (“ODC”) seeks review of a ruling of the disciplinary board ordering that respondent, Henry J. Lafont, Jr., be publicly reprimanded.
UNDERLYING FACTS
Count I — The Bone Matter
In 1996, respondent was retained to represent Robert M. Bone in a second degree murder case pending in Lafourche Parish. The crime was particularly heinous and the district attorney’s office refused respondent’s efforts to plead the charge down to manslaughter. Under the circumstances, respondent advised Mr. Bone that it would be in his best interest to plead guilty to second degree murder, to show remorse, and to save the State the expense and cost of a trial. Respondent suggested to Mr. Bone that this course of action would improve his chances for obtaining a commutation of his life sentence, because there would be no public record of the specific details of the brutal crime. Respondent also conveyed to Mr. Bone his confidence that he could obtain a letter of “no comment” from the district attorney at the time he applied for commutation, although no such letter then existed or was promised to be forthcoming.
lain December 1996, Mr. Bone pled guilty to the second degree murder charge. In connection with the guilty plea, the presiding judge, Judge Jerome J. Barbera, III, conducted a Boykin examination of Mr. Bone, as follows:
Q. The sentence for second degree murder is imprisonment at hard labor without the benefit of probation, parole or suspension of sentence. And that is *341 not discretionary. I have no choice. If I accept your plea today, then that is what the sentence of this court must be.
Has anyone assured you, Mr. Bone, or led you to believe that if you enter a plea of guilty to this charge today that at some time in the future that your sentence may be commuted to a term of years or that you may somehow be given favorable treatment either by the governor or by the department of probation and parole; has anyone promised you that?
A. No, Your Honor.
Q. I know that you have had maybe discussions with your lawyer about that. A. Yes, Your Honor.
Q. But no one has made any assurances to you or any promises to you that anything favorable will happen in the future in your case; is that correct?
A. That’s correct.
[[Image here]]

THE COURT:

Mr. Lafont, are you satisfied that your client understands his rights and the consequences of his plea?

MR. LAFONT:

Yes, I am, Judge.

THE COURT:

All right. And you also assure the Court that as far as you know he has not been made any promises as to the favorable disposition of his case which might be different from what we have discussed here today?

MR. LAFONT:

That is correct, Judge, [emphasis added]
IsSatisfied that Mr. Bone understood the consequences of his plea, the judge sentenced him to life in prison.
Sometime after the plea, Mr. Bone’s mother, Judy Bone, requested that respondent give her a copy of the no-comment letter. Respondent told her that a no-comment letter existed and that he had seen a copy of it in the district attorney’s file. According to respondent, he told Mrs. Bone this in order to comfort her, because he believed she was terminally ill. This conversation was tape-recorded by Mrs. Bone without respondent’s knowledge.
In December 1999, Mr. Bone filed an application for post-conviction relief, claiming, among other things, that he pled guilty because respondent had promised the no-comment letter would be supplied by the district attorney. An evidentiary hearing was conducted in March 2000 in order to determine whether Mr. Bone’s plea was free and voluntary. Prior to the hearing, a conference was conducted in Judge Barbera’s chambers, attended by the judge, respondent, representatives of the district attorney’s office, and Mr. Bone’s newly retained counsel, Laurie White. The parties agreed that respondent’s testimony would be stipulated in lieu of his live testimony. The district attorney, Walter Naquin, took handwritten notes as to how respondent would testify, and from these notes, an assistant district attorney prepared a typewritten stipulation that was read into the record by Ms. White. Respondent approved the handwritten notes but did not see or approve the typed version. Furthermore, neither respondent nor Mr. Naquin were present in court when Ms. White read from the typed stipulation into the record:

MS. WHITE:

Counsel for the defendant and the State have entered into the following stipulation concerning the testimony of Henry Lafont. If Mr. Lafont was called as a witness, he would testify in the following *342 manner: that he was the attorney of record for Robert Bone in. connection with the [4charge of second degree murder; that Mr. Lafont advised Mr. Bone that he thought it was in Mr. Bone’s best interest to plead guilty, ... to show remorse and to save the state expenses and costs.
Mr. Lafont further suggested that this may help Mr. Bone with regard to his chances for commutation.
He further advised Mr. Bone that he thought he could obtain a letter of no-comment from the District Attorney’s Office at the time of commutation, even though no such letter existed or was forthcoming or was promised.
He further advised Mrs. Bone and Robert Bone, both before and after the guilty plea, that such a letter existed and was forthcoming, when in fact such, a letter was not forthcoming from the DA’s office.
Mr. Lafont further advised Mr. Bone that if he pled guilty that his chances of having his life sentence reduced would be greater. Mr. Lafont suggested that a time period of 17 years was the statistical average if a life sentence was commuted.
In his testimony at the post-conviction hearing, Mr. Bone claimed that respondent told him if he pled guilty, the district attorney’s office would promise a no-comment letter to a commutation of the sentence. He also testified that respondent told him both before and after the plea that he had seen the district attorney’s no-comment letter; therefore, it was guaranteed. Mr. Bone further testified that before he pled guilty respondent told him that he would be eligible for commutation in seventeen to twenty-two years, which respondent later changed to fifteen years after doing more research. Finally, Mr. Bone told the court that he lied during the Boykin examination about being promised anything because respondent told him if he didn’t plead guilty, “I’d make the DA very mad, and they would blow everything up and I wouldn’t want to do that.”
|sBased on the stipulation and Mr. Bone’s testimony, Judge Barbera vacated the guilty plea[1] and- filed a complaint against respondent with the ODC. Similar complaints were filed by Ms. White and Mr. Naquin.
Count II — Respondent’s DWI Conviction
In July 2000, respondent was convicted of one count of driving while intoxicated, a misdemeanor violation of state law. Respondent was sentenced to serve six months in prison, which was suspended upon payment of a $1,000 fine and court costs, as well as the -completion of other special conditions.
DISCIPLINARY PROCEEDINGS

Formal Charges

Following its investigation, the ODC filed two counts of formal charges against respondent. As to the Bone matter, the ODC alleged that respondent’s conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.1(a) (failure to provide competent representation to a client), 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 3.3(a)(1) (making a false statement of material fact or law to a tribunal), 3.3(a)(4) (offering evidence that the lawyer knows to be false), 3.4(b) (falsifying evidence or offering an inducement to a witness to testify falsely), 4.1 (knowingly making a false statement of material fact or law to a third person), 4.4 (respect for *343 rights of third persons), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration |fiof justice). As to the DWI matter, the ODC alleged that respondent’s conduct violated Rule 8.4(b) (commission of a criminal act reflecting adversely on the lawyer’s honesty, trustworthiness, or fitness as a lawyer) of the Rules of Professional Conduct.
Respondent filed an answer. With respect to the Bone matter, he denied telling Mr. Bone or his mother before the plea that a no-comment letter existed. He also insisted that the stipulation read into the record at the post-conviction hearing was inaccurate and differed from the handwritten stipulation he had read and approved. As to the DWI matter, respondent asserted that his misdemeanor conviction does not reflect on his fitness to practice law.

Formal Hearing

This matter proceeded to a formal hearing, at which time the hearing committee heard the live testimony of several witnesses, including Ms. White, assistant district attorney Camille Morvant, Mr. Na-quin, and Judge Barbera. Neither Mr. Bone nor his mother testified, though the transcript of Mr. Bone’s post-conviction hearing was introduced into evidence. Respondent appeared at the hearing and testified on his own behalf.
Testimony Of LauRie White
Ms. White, who represented Mr. Bone in his post-conviction efforts and in his subsequent trial, testified that what led to the post-conviction proceedings was an audiotape secretly recorded by Mr. Bone’s mother, on which respondent is heard saying that he had seen the no-comment letter in the district attorney’s file but was unable to get a copy.
|7She stated that she spoke with respondent on the telephone and at the courthouse before the hearing and he confirmed everything that would eventually go into the typed stipulation. An associate in her office also interviewed respondent, wherein he again confirmed everything. She also said that after being told about the tape, respondent again admitted everything in discussions with Judge Barbera and the district attorney, Walter Naquin.
Ms. White asserted that although the stipulation contained somewhat conflicting statements, it agreed with what respondent told her at one point or another in their various conversations. She also stated that she was not involved in writing the stipulation but did read it into the record at the hearing. She further testified that she could not recall if respondent was in the courtroom when the stipulation was read.
Ms. White found several things wrong with respondent’s handling of Mr. Bone’s guilty plea:
The fact that [respondent] told [Mr. Bone] that a life sentence would be 15 to 17 to 25 years is just- not correct, and that the advice that he had given to the family basically was that a commutation was forthcoming, and commutations are not forthcoming, and that there was either a letter or a promise of a letter...-.
When she asked Mr. Bone why he had lied about being promised anything during the Boykin examination, she testified,
My client informed me that he was told he wasn’t supposed to bring this up or make any waves about it,- because that was going to make the District Attorney’s Office mad and then this deal on this no contest letter would be thrown out the window.
*344 | kTestimony Of Camille Morvant
Mr. Morvant, the assistant district attorney who prosecuted Mr. Bone’s case, testified that Ms. White told him about the audiotape but he never listened to it. He stated- that he was not- involved in the conversation that led to - the stipulation. He also did not think respondent was in the courtroom when the stipulation was read.
Mr. Morvant further testified that he never discussed a no-comment .letter with respondent and certainly made no promises about same. He asserted that the only discussions he had with respondent were about respondent’s request that he accept a manslaughter plea from Mr. Bone.
Mr. Morvant also stated that he had known respondent since 1982 and respondent seemed competent and honest.
Testimony Of Judge Jerome Barbera
Judge Barbera, who presided over Mr. Bone’s case, testified that what was told to Mr. Bone before and after the guilty plea was discussed with and agreed to by respondent during the conversation in his chambers before the hearing. However, he stated that he does not know what happened to the handwritten stipulation and could not recall if respondent read and approved the typed stipulation. Furthermore, he stated that he does not think respondent was in the courtroom when the stipulation was read.
Judge Barbera said that he considered a no-comment letter from the district attorney’s office to be a favorable thing for a defendant and if respondent told Mr. Bone before the plea that he was certain he could get such a letter, then respondent and Mr. Bone should have answered differently in the Boykin examination. Furthermore, he felt- that respondent had assured Mr. Bone that the district attorney’s | ¡jOffice would not object when commutation came up in the future even though the district attorney’s office never made such an assurance. In fact, in his meeting with respondent before the hearing, respondent admitted he never discussed a no-comment-letter with the district attorney’s office. Therefore, Judge Barbera felt the plea was not free and voluntary.
Judge Barbera also testified that he has known respondent for a long time and found him to be honorable and honest.
Testimony Of Walter Naquin
Mr. Naquin, the district attorney, testified that he confronted respondent about the tape and was aware that, before respondent knew about the tape, he had denied ever telling Mr. Bone’s mother that he had seen the no-comment letter in the district attorney’s file.
Mr. Naquin sat with respondent before the hearing and took handwritten notes of their discussion, which later became the typed stipulation. He asserted that the typed stipulation was what respondent had told him and what he had written down. However, he also stated that he does not believe respondent signed either the handwritten stipulation or the typed stipulation. Furthermore, he does not believe he showed respondent the typed stipulation, but only told him he did not have to testify and could leave. Mr. Naquin was not in the courtroom during the hearing, so he does not know if respondent was in the courtroom when the stipulation was read. He further testified that, to his knowledge, his handwritten notes were destroyed.
Mr. Naquin also testified as to respondent’s good character.
h (/Testimony Of Respondent
In his testimony, respondent admitted to having a conversation with Mr. Bone about the possibility of applying for commutation, but he denied promising or represent *345 ing that a favorable result would occur. Prior to the plea, another judge informed respondent that if a defendant pled guilty and showed remorse, statistically he would only have to serve 17 years before being able to apply for commutation, which he reiterated to Mr. Bone. Respondent thought it would help Mr. Bone with commutation in the future if he pled guilty and showed remorse instead of making everyone go through a trial. Respondent further testified that Mr. Bone’s sentence would only be commuted “if [Mr. Bone] behaved, if everything went well, if the Board agreed, if we had a good governor, all that came into play, and all that was explained to Mr. Bone.”
Respondent also admitted to informing Mr. Bone that he was confident he could obtain a no-comment letter from the district attorney’s office, which he later admitted had a great influence on Mr. Bone’s decision to plead guilty. Furthermore, respondent admitted that after the plea, he told Mr. Bone’s mother the no-comment letter existed. He also admitted this conduct was wrong, a mistake, and an error in judgment on his part, for which he was remorseful because of the wasted time and pain caused. However, he did not do it to gain an advantage but to give hope to Ms. Bone, who led him to believe she was dying. At that time, he even forgave the remaining $10,000 of the $15,000 legal fee Mr. Bone had agreed to pay.
When Ms. Wfliite informed him that she had been retained to try to get Mr. Bone a new trial, respondent asserted that he cooperated with her and did not try to hide anything. However, he denied ever telling Ms. Wfhite that he informed Mr. Bone before the plea that a no-comment letter existed.
In Judge Barbera, and Mr. Naquin told respondent about the tape, but respondent was not offered a chance to listen to the tape. Thereafter, he told Mr. Naquin, who took handwritten notes, that he informed Mr. Bone before the plea that he was “extremely confident” he could get a no-comment letter from the district attorney’s office. He then stated to Mr. Naquin that he told Mr. Bone’s mother after the plea that the letter existed. Respondent read over Mr. Naquin’s notes but did not review the typed stipulation or sit in court as it was read. He denied that he stipulated to telling Mr. Bone or his mother before the plea that the letter existed; however, he agreed with everything else in the typed stipulation.
Respondent further denied allowing Mr. Bone to make erroneous statements or making erroneous statements himself at the Boykin examination. He also claimed that Judge Barbera vacated Mr. Bone’s plea because Mr. Bqne seemed to be confused by what respondent told him before the plea and not because respondent lied to Mr. Bone.

Report of the Hearing Committee

Considering the evidence presented at the hearing, the hearing committee found that respondent violated the Rules of Professional Conduct as alleged in the formal charges. Respondent failed to provide competent representation because of his admitted lack of experience in handling second degree murder cases and because of misrepresentations he made to Mr. Bone about obtaining the no-comment letter. He also failed to act diligently because his entire representation of Mr. Bone consisted of convincing him to plead guilty. Respondent failed to keep Mr. Bone reasonably informed of the status of the no-comment letter and as such failed to comply with his requests for information. During the Boykin examination, | ^respondent made false statements to the court concerning reassurances he made to Mr. Bone about the no-comment letter and *346 allowed Mr. Bone to make the same false statements to the court. Furthermore, the rights of the court as a third party were violated when respondent and Mr. Bone made these false statements. Not only did respondent make false statements to the court, but he also made false statements to Mr. Bone when he told his client that the no-comment letter actually existed. Therefore, respondent’s assurances tó his client and false statements to the court that led to Mr. Bone’s guilty plea were prejudicial to the administration of justice. Finally, the committee determined respondent’s DWI conviction reflects adversely on his honesty, trustworthiness, and fitness as a lawyer.
The committee indicated that no mitigating factors were present. It did not address the subject of aggravating factors.
In light of its factual findings and determinations of rule violations, the committee recommended that respondent be suspended from the practice of law for three years. This recommendation was based on respondent’s lack of diligence and competence in representing Mr. Bone and his knowingly permitting false statements to be made to the court. The committee further recommended that respondent be assessed with all costs of this proceeding.
Both respondent and the ODC filed objections to the report and recommendation of the hearing committee.

Ruling of the Disciplinary Board

After reviewing the record, the disciplinary board found the committee’s factual findings to be manifestly erroneous. Conducting a de novo review of the record, the board determined that neither Mr. Bone’s testimony at his post-conviction | shearing nor the stipulation offered by respondent provided clear and convincing evidence that respondent made false statements to Mr. Bone, Mr. Bone’s mother, or the court before Mr. Bone pled guilty. Mr. Bone’s testimony was self-serving, and respondent never read the typed stipulation that was read into the record. Therefore, these two things only established that respondent was overly confident in assuring Mr. Bone that he thought he would be able to obtain a no-comment letter from the district attorney’s office. Furthermore, the board found that the statements respondent made to Mr; Bone before the plea did not rise to the level of assurances and promises; therefore, no false statements were made by either respondent or Mr. Bone during the Boykin examination. Finally, the board found respondent’s DWI charge is a misdemeanor and not a “serious crime.” Based on its own factual findings, the board determined that respondent’s conduct violated Rules 4.1 and 8.4(a) of the Rules of Professional Conduct.
The board found that respondent violated duties owed as a professional. Respondent’s conduct was both negligent and knowing. He harmed both Mr. Bone and Mr. Bone’s mother after the guilty plea by telling them the no-comment letter existed. To the extent that this conduct contributed to Mr. Bone’s guilty plea being vacated, the events of the murder were resurrected for the family of Mr. Bone’s victim.
Based on the ABA’s Standards for Imposing Lawyer Sanctions, the board determined the baseline sanction for respondent’s misconduct is a public reprimand. The aggravating factors present include respondent’s prior disciplinary offenses[2] *347 and substantial experience in the practice of law (admitted 1979). In mitigation, the board 1 uacknowledged the absence of a dishonest or selfish motive, full and free disclosure to the disciplinary board and a cooperative attitude toward the proceedings, character or reputation, imposition of other penalties or sanctions, remorse, and remoteness of prior offenses.
Based on the above findings and this court’s prior jurisprudence, the board ordered that respondent be publicly reprimanded and be assessed with all costs of this proceeding.
The ODC sought review of the board’s ruling in this court pursuant to Supreme Court XIX, § 11(G).[3] We directed the parties to brief the matter and docketed the case for oral argument.
DISCUSSION
Bar disciplinary matters fall under the original jurisdiction of this court. La. Const, art. V, § 5(B). We act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). Although we generally accept the credibility evaluations made by the hearing committee members, we are in no way bound by these findings.
For purposes of the Bone matter, the critical issue the ODC must prove is whether respondent informed Mr. Bone prior to his guilty plea that there existed a letter of no comment from the district attorney’s office. While the committee h ¿received a great deal of testimony on this issue, much of this testimony is based on second-hand information or speculation.
The only persons who had direct knowledge of what respondent told Mr. Bone were Mr. Bone and respondent. Respondent testified at the disciplinary hearing that he told Mr. Bone he was- confident he could obtain a no-comment letter, but denied informing Mr. Bone that such a letter existed. Although Mr. Bone testified at the post-conviction hearing that respondent advised him the no-comment letter existed prior to his guilty plea, the ODC did not produce Mr. Bone as a witness at the disciplinary hearing, making it difficult to evaluate his credibility.
The sole piece of objective evidence introduced by the ODC was the stipulation read into the record at the post-conviction hearing.[4] Unfortunately, as the board points out, this stipulation is internally inconsistent. According to the stipulation, respondent thought he could obtain a no-comment letter “at the time of commutation.” However, the stipulation also indicates that respondent told Mr. Bone and his mother both before and after the guilty plea that the letter “existed and was forthcoming. ...” Given this internal inconsistency, we cannot say this stipulation represents clear and convincing evidence that *348 respondent made promises to Mr. Bone in an effort to induce his guilty plea.
We acknowledge that the testimony of Mr. Naquin and Ms. White could support a. contrary conclusion. Nonetheless, as noted previously, these witnesses had no direct knowledge of the conversation that transpired between Mr. Bone and respondent. Their testimony represents their opinions or speculations as to what respondent may have said to Mr. Bone, but does not constitute clear and convincing |1fievidence of what was said to Mr. Bone. In the absence of such clear and convincing evidence, we are constrained to find the ODC has not proven violations of Rules 1.1(a), 1.3, 3.3(a)(1), 3.3(a)(4), 3.4(b), 4.1, 4.4, 8.4(c) and 8.4(d).
Nonetheless, we find the evidence in the record is sufficient to, support a finding that respondent failed to properly communicate with his client for purposes of Rule 1.4. Although respondent denied promising a favorable result to Mr. Bone, he admitted his statement that he was confident that he could' obtain a no-comment letter had a great influence on Mr. Bone’s decision to plead guilty. Much of the confusion in this case could have been eliminated if respondent had clearly and unambiguously communicated to Mr. Bone that he was in no way representing that Mr. Bone could obtain a favorable result in the future (commutation of his sentence) by entering the guilty plea. Therefore, based on respondent’s own admissions, we find he violated Rule 1.4.
We further find respondent’s DWI conviction constitutes a violation of Rule 8.4(b). Although this was a misdemeanor conviction, it does not reflect well on respondent’s trustworthiness or fitness to practice law, especially in light of the fact that his drinking problem may have contributed to his other misconduct.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and 117mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Respondent’s failure to adequately communicate with Mr. Bone placed an additional burden on the criminal justice system. His DWI conviction reflects adversely on his moral fitness.
Several mitigating factors are present, including remorse, lack of dishonest or selfish motive, and good character. The sole aggravating factors are respondent’s substantial experience in the practice of law and his prior disciplinary record. We note, however, that the prior infractions are remote in time.
Considering the record as a whole, we find a ninety-day suspension is the appropriate sanction for respondent’s misconduct.
DECREE
Upon review of the findings and recommendation of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Henry J. Lafont, Jr., Louisiana Bar Roll number 8094, be suspended from the practice of law in Louisiana for a period of ninety days. All costs and expenses in the matter are assessed against respondent in accordance with Supreme *349 Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
JOHNSON, J., would impose a more severe penalty.

 Retired Judge Melvin A. Shortess, assigned as Justice ad hoc, sitting for Associate Justice John L. Weimer, recused.

. Mr. Bone was subsequently tried and convicted of second degree murder.

. Respondent was privately reprimanded oh May 11, 1989 for violating DR 1-102 and DR 6-101(A)(3) of the Code of Professional Responsibility and Rules 1.1(a), 1.3, 1.4, and 8.4 of the Rules of Professional Conduct. Respondent was admonished by the disciplinary board on September 17, 1991 for violating *347 Rule 8.4(h) of the Rules of Professional Conduct.

. Ordinarily, a reprimand is a sanction which the disciplinary board may impose without the necessity of a recommendation to this court. Supreme Court Rule XIX, § 10(A)(4). However, under Supreme Court Rule XIX, § 11(G), the parties may request review in this court of the board’s imposition of a public reprimand.

. The ODC also introduced a tape recording of a conversation between Mrs. Bone and respondent in which respondent indicated that he possessed the no-comment letter. However, this conversation took place in 1999, long after Mr. Bone's 1996 guilty plea, and therefore has little probative value as to whether respondent advised Mr. Bone that the letter existed prior to Mr. Bone's guilty plea.