| ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respon *69 dent, Owen J. Trahant, Jr., an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS
At all times relevant to these proceedings, respondent confined his law practice to the handling of real estate closings. In the mid-1990’s, the volume of respondent’s business increased substantially.[1] At that time, O’Neal Jones, Jr., a lawyer who shared office space with respondent, agreed to assist by performing title examinations and notarial services for some of the closings that were assigned to respondent’s office for handling. This arrangement continued until April 2001, when Mr. Jones moved out of respondent’s office. The ODC alleges that respondent engaged in the following instances of misconduct during the period of his association with Mr. Jones:
Count I — The Thomas Matter
In July 2000, Youlanda Thomas entered into a written purchase agreement with Jose Vasquez to buy a home on River Ridge Drive in Lake Charles for |⅞$135,000.[2] Ms. Thomas applied to a mortgage broker, Infinity Mortgage Services, Inc. (“Infinity”), to obtain financing in connection with the purchase. Infinity secured funding for Ms. Thomas’s mortgage from American Fidelity, Inc. (“American Fidelity”) and retained respondent’s law office to handle the closing. The title examination and the closing were actually performed by Mr. Jones. !
Prior to Ms. Thomas’s closing, First Premier Financial Services, Inc. (“First Premier”) was inserted into the transaction without her knowledge or consent. Mr. Jones and Anthony Grishby were directors and incorporators of First Premier; Mr. Grishby was also a director and incorporator of Infinity. On August 22, 2000, First Premier purchased the River Ridge Drive property from Mr. Vasquez for $135,000, the true sales price. Mr. Grishby executed the Cash Sale on behalf of First Premier, and Mr. Jones notarized his signature. The sales price was then increased by $20,000, and by Cash Sale dated August 22, 2000, First Premier sold the River Ridge Drive property to Ms. Thomas for the inflated price of $155,000. Mr. Jones also notarized the Cash Sale documenting this transaction. Mr. Jones then notarized a $170,000 mortgage and related loan closing documents between Ms. Thomas, as the borrower, and American Fidelity, as the lender, for the River Ridge Drive property. In this transaction, the loan closing was designated as a “refinance” rather than a new purchase. The HUD-1 settlement statement prepared by respondent’s office falsely reported that First Premier held a $155,000 mortgage on the property.
Respondent was the title insurance agent for Ms. Thomas’s loan closing and had access to the title examination performed by Mr. Jones; therefore, he should have known that Ms. Thomas did not own the River Ridge Drive property prior to the closing in August 2000. Respondent also should have known that First Premier |sdid not have a mortgage on the property. Nevertheless, respondent’s staff prepared the HUD-1 settlement statement and other documents that allowed the property to be sold from Mr. Vasquez to First Premier and then “flipped” to Ms. Thomas as a refinance for an inflated price. Furthermore, respondent’s stamped signature appears on the title insurance policy which *70 contains false information about the First Premier “mortgage” on the River Ridge Drive property.
Count II — The Randell Matter
On August 29, 2000, Shawnette Randell entered into a written purchase agreement with Pledged Property II, LLC to buy a home on English Drive in Lafayette for $82,000. Ms. Randell applied to Infinity to provide financing in connection with the purchase. Infinity approved Ms. Randell’s application and retained respondent’s law office to handle the closing.
Respondent or his office staff performed the title examination on the English Drive property. Having done so, respondent should have known that Ms. Randell was not the current owner of the property. Nonetheless, respondent or his staff caused or allowed Ms. Randell’s purchase of the property to be falsely structured as a “refinance” rather than a new purchase. On August 31, 2000, Paul Champagne, a non-attorney notary public employed by respondent, closed a “refinance” loan for Ms. Randell on the English Drive property in the amount of $55,200. Of this amount, First Premier received $10,000, and Infinity received $1,387.82.
On September 7, 2000, after the rescission period elapsed on the “refinance” loan, $32,000 of the proceeds from the “refinancing” were used to actually acquire the English Drive property from the seller, Pledged Property II, LLC. Respondent’s staff prepared the HUD-1 settlement statement and the Cash Sale in connection with Ms. Randell’s “new purchase” closing. Although Ms. Randell did |4not own the English Drive property until the date of the closing, respondent nevertheless issued a title insurance policy dated August 31, 2000, falsely listing Ms. Randell as the owner of the property as of that date.
In both Counts I and II, the ODC alleges that respondent’s conduct violated Rules 8.4(a) (violation of the Rules of Professional Conduct) and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct.
Count III — The Landry Matter
Alton Landry, Sr. and his wife, Gloria Landry, had six children. After Mrs. Landry died, Mr. Landry and one of his daughters, Reggie Landry, applied for a loan using the family home as collateral. The lender retained respondent’s law office to handle the closing, which required the opening of a succession for Mrs. Landry, as well as the execution of an act of donation by which the Landry children would donate their interests in the home to their father. Respondent’s office staff prepared the necessary documents; Mr. Jones was assigned to handle the loan closing and the succession and donation matters.
In April 2000, Mr. Jones closed Mr. Landry’s loan and notarized the act of donation, which had been executed outside of his presence. The act of donation was then filed into the public record. Because of tax issues relating to the succession, no succession documents were filed at that time. It was later alleged that the signatures of some of the Landry children were forged on the act of donation.
Respondent charged $750 to handle Mrs. Landry’s succession, which included $150 for court costs. This sum was withheld from the proceeds of Mr. Landry’s loan, as evidenced by the HUD-1 settlement statement. Respondent admits that he received $750 and that he deposited the funds into his operating | .^account, rather than his client trust account. However, as a result of the forgery allegations, respondent did not file Mrs. Landry’s succession documents and did not obtain a judgment *71 of possession. Nevertheless, respondent failed to refund the unearned portion of the fee he was paid and failed to refund the $150 intended for court costs.[3]
In Count III, the ODC alleges that respondent’s conduct violated Rules 1.5(f)(6) (failure to refund an unearned fee)[4] and 8.4(a) of the Rules of Professional Conduct.
DISCIPLINARY PROCEEDINGS
In March 2002, Ms. Thomas filed a complaint with the ODC against respondent and Mr. Jones. In 2004, the ODC opened an investigation into the Randell matter. During this time, the ODC learned that a federal criminal probe was ongoing into the fraudulent real estate scheme perpetrated by Mr. Grishby. As a result, the ODC delayed taking any further action pending the conclusion of the federal investigation. In July 2005, a grand jury in the Western District of Louisiana handed up a 65-count indictment against Mr. Grishby and others.[5] Neither respondent nor Mr. Jones was named in the indictment. When it became clear that the United States Attorney was not pursuing criminal charges against respondent or Mr. Jones, the ODC concluded its investigation and filed separate sets of formal charges against respondent and Mr. Jones in March 2011. The ODC | fimoved to consolidate the formal charges for hearing, but the motion was opposed by both respondent and Mr. Jones and was subsequently denied.[6]
Respondent, through counsel, answered the formal charges and denied any misconduct. Alternatively, respondent asserted the affirmative defense of liberative prescription pursuant to Supreme Court Rule XIX, § 31.[7] This matter then proceeded to a formal hearing on the merits.

Hearing Committee Report

After considering the testimony and evidence presented at the hearing, the committee made the following factual findings:
Respondent engaged in a law practice that included real estate closings. He employed several individuals who assisted him with his practice, including his daughter, Renee Trahant, who served as the office manager; O’Neal Jones, Jr., an attorney; and Paul Champagne, a non-attor *72 ney notary. During the pertinent times outlined in the formal charges, respondent received business and assignments from multiple title insurance companies and then, through his daughter, assigned certain title examinations and closing services to Mr. Jones. Mr. Jones received a portion of the fees collected at closing as part of his fee from respondent. Respondent needed Mr. Jones’s assistance because his real estate practice had “exploded.” Respondent trusted Mr. Jones and allowed him to work unsupervised. There was no review by respondent of Mr. Jones’s work or files. Respondent also did not | supervise his other employees, Ms. Tra-hant and Mr. Champagne, or his supervision of them was inadequate, due either to a lack of diligence or because of the volume of the law practice.
Respondent was the only licensed title insurance agent at the time of the closings at issue in the formal charges. Mr. Jones did not have a separate office because most of his work was conducted on the road. It is clear from the evidence submitted that respondent ran an extremely loose ship of an office, entrusting the directing of the assignments and most of the paperwork to his daughter.
The loose running of the office, the manner in which the assignments were made, the lack of supervision and control over the employees, and the high volume of business were all factors that resulted in Youlanda Thomas (Count I) and Shaw-nette Randell (Count II) becoming victims of the “house flipping” scheme that was perpetrated by Infinity, First Premier, and other entities with the help of respondent’s office. Respondent had no ownership or financial interest in Infinity or First Premier, nor did he have a relationship with director/owner Anthony Grishby. Mr. Jones did have a business relationship with Mr. Grishby and was at least a listed director on corporate documents of First Premier. Respondent had no knowledge of the type of relationship Mr. Jones had with the various financial institutions owned and/or operated by Mr. Grishby.
The committee observed that although numerous documents were introduced into evidence by both respondent and the ODC, none were the “smoking gun” that proved respondent’s direct dishonesty, fraud, deceit, or misrepresentation. No evidence supported a finding that respondent was complicit in the fraudulent activities. However, the committee found that respondent’s failure to supervise his staff allowed the fraudulent loans to be processed.
Additionally, the committee made the following findings specifically relating to each count of the formal charges:
1 ¡¡Count I — Jose Vasquez reached an agreement to sell his home to Youlanda Thomas. Despite his intention, Mr. Vasquez actually sold the property to First Premier, who in turn sold it to Ms. Thomas for a price that had been increased by $20,000. Mr. Vazquez did not ask any questions at the closing. He later discovered the improprieties of these transactions and reported them accordingly, which resulted in the filing of formal charges against respondent and Mr. Jones.
Respondent’s firm was assigned to do the closing for the Thomas property. Mr. Jones handled the title examination with no oversight or review by respondent, and he notarized both of the questionable cash sale documents. Respondent was not present at the closing, but he did collect a fee.
The committee found that the Thomas closing should have been an outright new home purchase for the price Ms. Thomas originally agreed to, but it was not. Instead, the transaction was listed on the *73 closing paperwork as a “refinance,” which it should not have been since Ms. Thomas did not own the property before the actual cash sale. Respondent acknowledged that this was an illegal “house flipping” scheme. There was no proof provided at the hearing that respondent was aware of the “house flipping” scheme or any problems specifically related to the Thomas closing, and of the parties involved in the scheme, only Mr. Grishby was formally prosecuted by federal authorities.
Count II — Shawnette Randell was another innocent victim of the “house flipping” scheme. She agreed to purchase a house for $32,000, but she ended up paying $55,000 because she was duped into believing that she owed money for a credit card bill that did not exist. This deception was perpetrated by Infinity and its owner/employees. Ms. Randell never met respondent, nor was respondent present at her closing. Respondent’s employee, Paul Champagne, notarized the closing documents without any knowledge that he was doing anything wrong; he simply followed the instructions of the office manager to close the Randell loan.
|flWhen the title commitment request was faxed to respondent’s office from Infinity, it showed that First Premier had a mortgage on the property Ms. Randell was acquiring. Respondent did not learn until after the closing that First Premier had no mortgage and that the title commitment request was a fraudulent document. As in Count I, Ms. Randell’s closing was set up as a refinancing, though she did not own the property before the cash sale. Respondent confirmed that his office staff did the title work and should have known there was no prior First Premier mortgage; however, the red flags did not alert respondent’s staff that there was a problem. The HUD-1 settlement statement for the first transaction, which lists no seller, was prepared by Equicredit and was set up as a refinancing. The second HUD-1 settlement statement was prepared by respondent’s staff with the proper contract sales price of $32,000.
Based on these factual findings, the committee determined that respondent failed to supervise his office staff, in violation of Rules 8.4(a) and 8.4(c), as well as Rules 5.1 (responsibilities of partners, managers, and supervisory lawyers) and 5.3 (responsibilities regarding nonlawyer assistants).[8] Respondent had a very busy, overwhelming, and voluminous real estate closing practice. He entrusted an associate, Mr. Jones, and nonlawyers, including his daughter and Mr. Champagne, to keep the practice afloat. These employees did not act in an ethical manner, whether intentionally or negligently, and their conduct led to fraudulent loans. Respondent’s negligent supervision facilitated this behavior.
Count III — Respondent was hired to complete the succession of Gloria Landry in connection with a loan application by her husband, Alton Landry, Sr., and her daughter, Ms. Reggie Landry. Respondent assigned the matter to Mr. |10Jones for handling. It was later learned that the signatures of certain necessary family members were forged on an act of donation. Because of the forgeries, the succession was not completed or filed by respondent or his staff. The committee found credible respondent’s testimony that he did not know about the forgeries and did *74 not participate in procuring the forged signatures on the act of donation.
Respondent charged and collected a $600 fee to handle Mrs. Landry’s succession, as well as a $150 filing fee, for a total of $750. Respondent admitted that he received the fee on or about April 19, 2000. He deposited the funds into his account and spent the money, but the succession was never completed. Respondent claims that until he gave a sworn statement to the ODC in May 2006, he did not even think about refunding the money, nor did he consider the impropriety of collecting the entire fee without having completed the work. Nevertheless, even after the sworn statement and being put on notice of the need to make at least a partial refund to the Landrys, respondent made no attempts to refund any part of the fee. Furthermore, respondent did not put any amount into his trust account while the dispute was ongoing for the uncompleted work.
Based on these factual findings, the committee determined that respondent violated Rule 1.5(f)(6) in Count III. While respondent may have earned a portion of the $750 he collected by preparing some of the succession documents, he was hired to actually complete the succession through filing, which he clearly never did. Therefore, respondent was required to promptly refund all or a portion of the fee and all of the court costs directly to the Landry family. Respondent failed to do so. Whether respondent ultimately paid the $750 to anyone else, and whether the succession was actually filed later, are all immaterial as to the specific violation of failure to refund the fees.
The committee determined that respondent’s misconduct was negligent, but that the applicable baseline sanction is suspension. In mitigation, the committee | n found the following factors: absence of a dishonest or selfish motive, a cooperative attitude toward the proceedings, delay in the disciplinary proceedings, and remorse. The committee also cited in mitigation the fact that no criminal charges were brought against respondent in the “house flipping” scheme, and that there have been no disciplinary proceedings against him since the events at issue here. The committee found the following aggravating factors: a prior disciplinary record (a 1998 admonition for neglecting a legal matter), vulnerability of the victims, and substantial experience in the practice of law (admitted 1974).
For the foregoing reasons, the committee recommended that respondent be suspended from the practice of law for sixty days, fully deferred, subject to conditions specified in its report. Both respondent and the ODC objected to the hearing committee’s report and recommendation.

Disciplinary Board Recommendation

At the outset, the disciplinary board rejected respondent’s affirmative defense of liberative prescription, noting that more than ten years did not elapse between the alleged misconduct and the filing of the complaints in Counts I and II. Respondent’s mental state is not a factor in this determination.
Turning to the merits, the disciplinary board determined that the hearing committee’s factual findings are not manifestly erroneous and adopted same. The board also determined the committee correctly applied the Rules of Professional Conduct.
The board found respondent violated duties owed to his clients, the legal system, and the legal profession when he delegated his professional responsibilities to nonlaw-yer personnel and an associate lawyer who acted in violation of the Rules of Professional Conduct. Respondent acted knowingly, which caused substantial financial *75 harm to his clients and tarnished the image of the legal profession. After | ^considering the ABA’s Standards for Imposing Lawyer Sanctions, the board determined that the applicable baseline sanction is suspension.
In aggravation, the board found the following factors: a prior disciplinary record, ■vulnerability of the victims, and substantial experience in the practice of law. In mitigation, the board found the absence of a dishonest or selfish motive, a cooperative attitude toward the disciplinary proceedings, and remorse.
Considering this court’s prior jurisprudence addressing a lawyer’s failure to supervise, the board determined that the fully deferred suspension recommended by the committee is too lenient, and that an actual period of suspension is necessary. Accordingly, the board recommended that respondent be suspended from the practice of law for ninety days, followed by a one-year period of supervised probation to include Ethics School.
Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Banks, 09-1212 (La.10/2/09), 18 So.3d 57.
As a procedural matter, we reject respondent’s argument that Supreme Court Rule XIX, § 31 applies in this case and that Counts I and II of the formal charges are prescribed. For liberative prescription to apply, two elements must be established: (1) the disciplinary complaint or investigation must involve conduct which took place more than ten years ago, and (2) the lawyer must have acted | ^negligently. In re: Stanford, 10-1547 (La.12/17/10), 50 So.3d 151. Here, the complaints were lodged against respondent in 2002 and 2004, less than ten years after the alleged misconduct, which occurred in 2000. Furthermore, we do not find that respondent’s misconduct was negligent. Therefore, Rule XIX, § 31 is inapplicable.
Turning to the merits, the record of this matter supports the hearing committee’s factual findings. Essentially, respondent abdicated his professional responsibilities to others in his law office, which in turn facilitated a pattern of fraudulent real estate closings. Importantly, however, respondent did not originate the fraudulent scheme and was not an active participant in it. He also failed to refund an unearned legal fee. Based on these facts, respondent has violated Rules 1.5(f)(6), 5.1, and 5.3 of the Rules of Professional Conduct.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In determining a sanction, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La. 1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
*76 Respondent knowingly and intentionally violated duties owed to his clients, the legal system, and the legal profession. His misconduct caused actual harm to his clients and to the legal profession. The baseline sanction for this type of misconduct is suspension.
In mitigation, we agree with the committee and the board that respondent is remorseful for his misconduct and that he has displayed a cooperative attitude | ^toward these proceedings. The following aggravating factors are present: a pri- or disciplinary record, a selfish motive, a pattern of misconduct, multiple offenses, vulnerability of the victims, and substantial experience in the practice of law.
Under these circumstances, we find respondent’s misconduct warrants an actual period of suspension of six months. Following his suspension, respondent shall be placed on supervised probation for a period of one year. During the period of probation, respondent shall attend the Ethics School program offered by the Louisiana State Bar Association and make restitution of $750 plus legal interest to the Alton Landry, Sr. family.
DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Owen J. Trahant, Jr., Louisiana Bar Roll number 12890, be and he hereby is suspended from the practice of law for six months, followed by a one-year period of supervised probation governed by the terms and conditions set forth in this opinion. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
KNOLL, Justice, concurs in part and dissents in part with reason.

. Respondent’s office was closing an average of 100 loans per month and performing in the range of 300-400 title examinations per month.

. Youlanda Thomas died prior to the hearing in this matter.

. In 2009, more than eight years after respondent collected the fee in the Landry matter, another attorney was hired to complete Mrs. Landry’s succession in connection with a bank foreclosure against the property. Respondent paid the attorney $750 to compensate him for his work, but he now acknowledges that he should have made a refund to the Landry family, not a third party.

. At the time of the alleged misconduct in Count III, an attorney’s duty to refund unearned fees was set forth in Rule 1.5(f)(6). Rule 1.5(f)(5) is the current version of the rule.

. In 2006, Mr. Grishby pleaded guilty to one count of mail fraud arising out of what the factual basis described as "an elaborate scheme to obtain loans for unqualified borrowers and to falsely inflate fees and commissions for loans brokered by his mortgage brokerage company, Infinity Mortgage Services, Inc.” Mr. Grishby was sentenced to serve 36 months in federal prison.

. After the motion to consolidate was denied, respondent’s case and Mr. Jones’s case were tried separately before different hearing committees.

. Respondent asserted that Rule XIX, § 31 was applicable because the conduct at issue in the formal charges (specifically Counts I and II) occurred more than ten years prior to the date on which the formal charges were filed. Section 31 provides:
A disciplinary complaint, or the initiation of a disciplinary investigation with regard to allegations of attorney misconduct, where the mental element is merely negligence, shall be subject to a prescriptive period of ten years from the date of the alleged offense.

. The violations of Rules 5.1 and 5.3 were not charged in the formal charges; however, the committee found respondent had fair and adequate notice that he was being charged either for his misconduct or that of his staff. Respondent has raised no objection to the committee’s finding in this regard.