ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
1 iThis disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Stephen K. Peters, an attorney licensed to practice law in Louisiana.
UNDERLYING FACTS

The Kibby Matter

In 1991, Eloise Kibby paid respondent $1,200 to represent her in a divorce, child custody, and child support matter. In April 1991, respondent filed a petition for divorce on behalf of Ms. Kibby. In July 1991, the judge signed a stipulated judgment which resolved the custody and support issues. Thereafter, respondent abandoned the case without obtaining a judgment of divorce. Ms. Kibby was unaware that respondent had not obtained a judgment of divorce until several years later, when this fact was brought to her attention by another lawyer.

The Osborne Matter

The facts of this matter are not in dispute, as they have been stipulated to by the parties.[1]
In August 1999, Mary Osborne hired respondent to represent her in a Chapter 13 bankruptcy. Respondent’s $1,000 fee was paid from the bankruptcy plan. Ms. | ¡.Osborne’s bankruptcy was filed on August 30, 1999 and confirmed on December 1, 1999. In February 2000, Ms. Osborne’s mortgage company moved to lift the automatic bankruptcy stay on her home, to which motion respondent filed an objection. The hearing on the motion was continued twice in order to allow Ms. Osborne time to modify her bankruptcy plan to cure the arrearage pertaining to her mortgage. Copies of certain documents which were to be used in support of the modified plan were hand-delivered by Ms. Osborne to respondent’s office on March 3, 2000. Because respondent’s office misplaced the copies, she hand-delivered a second set on April 18, 2000. Nonetheless, respondent did not modify the bankruptcy plan. Consequently, on April 19, 2000, the automatic *849 stay was lifted and the mortgage company was allowed to proceed with foreclosure.

The Modeliste Matter

The facts of this matter are not in dispute, as they have been stipulated to by the parties.
In early 2003, Samantha Modeliste hired respondent to represent her in a Chapter 13 bankruptcy. Respondent required that Ms. Modeliste pay $600 in advance legal fees plus $185 for filing fees. The remainder of respondent’s $1,200 fee was to be paid through the bankruptcy plan. On January 13, 2003, Ms. Modeliste paid respondent $600 plus the $185 earmarked for the filing fee. On January 14, 2003, before signing the bankruptcy documents, Ms. Modeliste notified respondent that she had changed her mind about fifing bankruptcy. Although she requested a full refund, respondent claimed that he had already completed the bankruptcy documents, thereby earning the $600 retainer.[2] On January 16, 2003, respondent refunded the |⅞$185 fifing fee to Ms. Modeliste. However, for the three days the $185 was in his possession, respondent failed to maintain those funds in his trust account and instead commingled the funds with his own funds.

The King Matter

The facts of this matter are not in dispute, as they have been stipulated to by the parties.
In June 2003, Charlella King hired respondent to represent her in a Chapter 13 bankruptcy. Respondent required that Ms. King pay $600 in advance legal fees plus $185 for fifing fees. The remainder of respondent’s $1,200 fee was to be paid through the bankruptcy plan. In July 2003, Ms. King paid respondent $600 plus the $185 earmarked for the fifing fee. Approximately three weeks later, before signing the bankruptcy documents, Ms. King notified respondent that she had changed her mind about fifing bankruptcy. Although she requested a full refund, respondent claimed that he had already completed the bankruptcy documents, thereby earning the $600 retainer.[3] On August 28, 2003, respondent refunded the $185 fifing fee to Ms. King. However, for the approximately two months- the $185 was in his possession, respondent failed to maintain those funds in his trust account and instead commingled the funds with his own funds.

The First Commingling Matter

The facts of this matter are not in dispute, as they have been stipulated to by the parties.
|40n December 26, 2002, respondent deposited $1,584.66 in personal funds into his client trust account. He commingled these personal funds in his trust account for approximately one year, until December 4, 2003. Furthermore, between December 2003 and July 2004, there was no activity in respondent’s client trust account. The balance in the trust account during this period was $2,638.72, of which $1,735 was disputed fees maintained in trust. However, the remaining $903.72 represented respondent’s personal funds commingled in the trust account.

The Cummings Matter

In 2001, Daniel and Janet Cummings filed for Chapter 13 bankruptcy, which was later converted to a Chapter 7 bankruptcy. *850 On September 15, 2003, the Cummings hired respondent to represent them in filing another Chapter 13 bankruptcy. After the Cummings disclosed to respondent the details of their prior bankruptcy, he agreed to handle their case for $1,200. Respondent required that the Cummings pay $600 in advance legal fees plus $185 for filing fees. On the same date, the Cummings paid respondent $750, leaving a $35 balance owed toward the required advance payments. The Cummings understood that respondent would not start working on their case until they paid the balance due.
The next day, the Cummings notified respondent that they had decided not to file bankruptcy. Although they requested a full refund, respondent claimed that he had already begun working on their case; therefore, he only refunded $375.
In October 2003, the Cummings returned to respondent for help filing a Chapter 7 bankruptcy. Respondent’s fee was $700; however, since he had previously retained $375 paid by the Cummings, he agreed to handle the Chapter 7 bankruptcy for an additional $325. The Cummings paid respondent $325 on October 6, 2003. Approximately one week later, respondent advised the Cummings that they were not | ^eligible for Chapter 7 relief because they had previously filed a Chapter 7 bankruptcy in 2001. Despite this fact, respondent only refunded $100 to the Cummings.
The Cummings disputed that respondent earned any of the $600 fee he kept. Nonetheless, respondent failed to deposit the disputed fee into his client trust account and failed to provide the Cummings with an accounting. The disputed fee issue has been referred to the LSBA’s fee dispute resolution program.

The Vance Matter

In March 2000, Ida Vance hired respondent to represent her in filing Chapter 7 bankruptcy. Ms. Vance paid $400 towards respondent’s $700 fee and understood that respondent would not begin working on her case until she paid the $300 balance.
Subsequently, Ms. Vance contacted respondent and requested a full refund because she was unable to pay the $300 and did not wish to proceed with the bankruptcy. However, respondent claimed he had already begun working on her case; therefore, he only agreed to refund $200. Ms. Vance refused to accept anything less than a full refund, and no refund was provided at that time.
Some time later, Ms. Vance contacted respondent again to request a refund of the $400 she paid. By this time, respondent was only willing to refund $100 and forwarded a check in that amount to Ms. Vance in January 2004. Ms. Vance returned the check to respondent with a written request for a full refund. Respondent failed to comply with this request. Furthermore, despite the existence of the fee dispute, respondent failed to deposit the disputed funds into his client trust account and failed to provide Ms. Vance with an accounting. The disputed fee issue has been referred to the LSBA’s fee dispute resolution program.
| RThe Bessie Matter
In March 2004, Charley Bessie consulted with respondent about filing a Chapter 13 bankruptcy. Respondent agreed to handle the case for $1,500. Respondent required that Mr. Bessie pay $600 in advance legal fees plus $194 for filing fees. On April 1, 2004, Mr. Bessie paid respondent $794. Respondent then provided him with documents to review and sign. However, later that same day, before Mr. Bessie signed the documents, he terminated the representation and requested a refund. Respondent claimed to have earned the $600 advance fee and agreed only to re *851 fund the $194 in filing costs. Respondent issued a check to Mr. Bessie from his operating account in that amount. Respondent failed to deposit the disputed fee into his client trust account and failed to provide Mr. Bessie with an accounting. The disputed fee issue has been referred to the LSBA’s fee dispute resolution program.

The Melanie Williams Matter

Melanie Williams Sinclair worked as respondent’s secretary from approximately 1989 to 1994. In December 1995, Melanie separated from her husband, Dorman Sinclair, and instituted divorce proceedings in the East Baton Rouge Parish Family Court. Sometime after the petition was filed, respondent began to pursue a romantic relationship with Melanie.[4]
In February 1996, respondent began representing Melanie in her divorce proceeding. On May 29, 1996, respondent prepared and notarized a motion to proceed in forma pauperis on Melanie’s behalf. Notably, in response to the question |7“Po you have any income or asset which is not shown above?,” respondent did not disclose to the Family Court that he was personally providing Melanie with substantial financial assistance. Specifically, between April 28, 1996 and May 27, 1997, respondent gave Melanie a total of $82,781.00 in checks payable to her or to third parties on her behalf.[5]
In October 1996, a judgment of divorce was granted in Melanie’s divorce proceeding. Respondent continued to represent Melanie in settlement efforts regarding community property and other matters. In February, March, and April 1997, Dor-man’s attorney forwarded written settlement offers to respondent; however, respondent failed to convey the offers to Melanie.
In June 1997, Melanie terminated respondent’s representation. The community property issues were ultimately resolved through a consent judgment prepared by Dorman’s attorney.

The Neinstedt Matter

In 1998, respondent represented Vernon Neinstedt in a Chapter 7 bankruptcy. Mr. Neinstedt owned a boat that he planned to relinquish through the bankruptcy. Respondent wanted to purchase the boat as a gift for Warren Williams (Melanie Williams’ brother) and his nephew, so he arranged for Warren to buy the boat from the bankruptcy trustee.[6] Respondent misled both his client and the bankruptcy trustee |8into believing that Warren was the actual purchaser when, in fact, respon *852 dent funded the transaction.[7]

The Warren Williams Matter

In July 1998, respondent used his own money to form GZP, Inc., a Louisiana corporation.[8] Through GZP, Inc., respondent then purchased a video store for the purpose of giving the store as a gift to Warren Williams to own and operate. In mid-2000, when respondent’s relationship with Warren and his sisters, Melanie Williams and Johanna Porche,[9] soured, respondent sought monetary reimbursement from Warren for his “interest” in GZP, Inc. and the video store. On June 23, 2000, respondent wrote to Warren and demanded $7,412.99 in reimbursement. Three days later, he wrote to Warren again and demanded $48,420 in reimbursement.
On June 26, 2000, attorney Jeff Seaver wrote to respondent advising him that he represented Warren and GZP, Inc. Mr. Seaver also demanded that respondent cease and desist all communication with his clients. On June 28, 2000, respondent communicated with Mr. Seaver in writing about the GZP dispute, and thus he was aware that Warren and GZP were represented by counsel. Nevertheless, on June 29, 2000, respondent communicated in writing directly with Warren.
On June 30, 2000, respondent filed a lawsuit against GZP, Inc., seeking to have himself appointed temporary receiver and ultimately appointed permanent receiver 19of GZP, Inc. In furtherance of this objec-five, respondent mischaracterized himself to the court as a 50% shareholder, director, and officer of GZP, Inc. Based on this mischaracterization, the judge appointed respondent temporary receiver.

The Tax Matters

The facts of these matters are not in dispute, as they have been stipulated to by the parties.
State Income Taxes: Respondent failed to timely pay personal and/or business income taxes to the State of Louisiana in 1994, 1995, and 1996. As a result, the Louisiana Department of Revenue and Taxation garnished respondent’s personal checking account, as well as his fees from bankruptcy cases, which were garnished directly from the Chapter 13 Trustee. In 2001, respondent’s Chapter 13 fees were once again garnished for tax years 1997 and 1998.
Unemployment Taxes: From approximately the fourth quarter of 1994 through the fourth quarter of 2003, respondent failed to file unemployment tax returns and failed to remit unemployment tax payments to the Louisiana Department of Labor with respect to his employees. The State filed a lawsuit against him, seeking to have a $7,630.01 unpaid assessment made executory. More recent records indicate the unemployment tax assessment owed by respondent has grown to $14,630.28.
*853 Federal Taxes: From at least the first quarter of 1998 through the first quarter of 2004, respondent withheld federal income tax and/or FICA from his employees’ paychecks.[10] However, he failed to timely file his employer’s quarterly federal tax returns and further failed to remit to the federal government those funds withheld from his employees’ paychecks. Respondent also failed to maintain the funds owed |into the federal government and, instead, used the funds for his own benefit. Respondent owes approximately $33,500 to the federal government.

The Porche Matter

The facts of this matter are not in dispute, as they have been stipulated to by the parties.
Between February 1996 and May 1998, Johanna Porche worked for respondent as a contract employee. Respondent paid Johanna $300 a week, and he routinely issued her two checks — one for $200 from his operating account and one for $100 from his client trust account. Respondent did not convert client funds in making these payments from his trust account; however, he did make the payments with personal funds commingled in the account. Furthermore, although respondent’s financial records indicate he paid Johanna at least $13,352.23 in 1997, he reported her non-employee compensation on Form 1099 as only $10,000.

The Second Commingling Matter

The facts of this matter are not in dispute, as they have been stipulated to by the parties.
From approximately 1996 through 2004, respondent made payments from his client trust account for personal and business expenses and gifts. Respondent did not convert client funds in making these payments from his trust account; however, he did make the payments with personal funds commingled in the account. By way of example, in June 1996, respondent paid a total of $7,600 to Melanie Williams Sinclair and a total of $1,500 to Johanna Porche. In August 1997, respondent paid $270 to Pied Piper Apartments; $4,529.95 to Cavins for auto repair services; $99.14 to Entergy; $4,000 to Barbara Dufour; $3,000 to Benny’s Automotive; $1,000 to InPhilip Porche for a loan; and $15,000 to Patrick McGrew for a loan. In July 2001, respondent paid a total of $28,000 to Wendell Blount to fund a joint venture.
DISCIPLINARY PROCEEDINGS
In March 2005, the ODC filed sixteen counts of formal charges against respondent, alleging that his conduct violated Rules 1.2 (scope of the representation), 1.3 (failure to act with reasonable diligence and promptness in representing a client), 1.4 (failure to communicate with a client), 1.5(f)(6) (failure to refund an unearned fee), 1.7(b) (conflict of interest), 1.15(a) (safekeeping property of clients or third persons), 3.3 (lack of candor toward the tribunal), 4.2 (communication with a person represented by counsel), and 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation) of the Rules of Professional Conduct. Respondent answered the formal charges and denied any misconduct. This matter then proceeded to a formal hearing.

Hearing Committee Report

After considering the evidence and testimony presented at the hearing, the hearing committee filed its report with the disciplinary board.
In the Kibby matter, the committee found that Ms. Kibby paid respondent to represent her in a divorce. A stipulated *854 judgment resolved child custody and support issues; however, respondent never obtained the divorce for Ms. Kibby. She did not learn that she was not divorced for approximately ten years. Thereafter, she did not obtain a divorce and testified that she did not want a divorce. Respondent testified that Ms. Kibby did not keep in contact with him. There is no evidence to indicate it was not Ms. Kibby who failed to communicate with respondent in order for him to | ^obtain the divorce. Based on these factual findings, the committee determined that respondent did not violate Rules 1.3 and 1.4 of the Rules of Professional Conduct.
In the Osborne matter, the committee found that after assisting Ms. Osborne in filing bankruptcy, respondent filed an objection for her to the mortgage company’s motion to lift stay. Respondent appeared at the hearing on the motion, but his client did not. There was no convincing testimony as to why Ms. Osborne was not at the hearing. Thereafter, on her own, Ms. Osborne modified her bankruptcy plan and resolved the issue with her mortgage company. Ms. Osborne admitted that there may have been some miscommunieation with respondent about the missing mortgage payments; however, she reiterated her claim that respondent did not assist her in appealing the bankruptcy ruling lifting the stay. Respondent testified that he believed he dropped the ball in this matter; he showed remorse and apologized. The committee determined that respondent violated Rule 1.3 but did not violate Rule 1.4.
In both the Modeliste and King matters, the committee found that respondent did not maintain the $185 advance filing fees in his client trust account. Nevertheless, the committee found no violation of Rule 1.15(a).
In both the first and second commingling matters, the committee found that respondent deposited his own funds in his client trust account and maintained those funds with client funds, in violation of Rule 1.15(a).
In the Cummings matter, the committee found that on September 15, 2003, the Cummings paid respondent $750 towards a $785 advance fee to handle their Chapter 13 bankruptcy. The next day the Cummings informed respondent that they did not want to file the bankruptcy and requested a refund. The Cummings alleged that respondent informed them he would not begin working on their matter until they paid the entire fee. However, respondent alleged he explained to the Cummings that he would not file the bankruptcy until the entire fee was paid. Respondent refunded | ia$375. Although the Cummings were not satisfied with this refund, they returned to respondent a month later asking him to file a Chapter 7 bankruptcy instead of the original Chapter 13. Respondent agreed to apply the funds he retained in the Chapter 13 bankruptcy to the Chapter 7. Respondent did not recall that the Cummings were not eligible to file a Chapter 7 bankruptcy and additional work was performed by respondent’s office prior to his recalling that fact. Therefore, respondent only refunded $100 of the total $700 fee paid by the Cummings. The committee determined that respondent did not violate Rules 1.2 and 8.4(c) but did violate Rule 1.5(f)(6).
In the Vance matter, the committee found that Ms. Vance paid respondent $400 towards a $700 fee to handle her bankruptcy matter. She understood that respondent would not work on her bankruptcy until she paid the balance. However, respondent alleged that he told Ms. Vance he would not file the bankruptcy until she paid the balance. She was un *855 able to pay the balance and requested a refund. Respondent had begun work on the case and agreed to refund only $200, which Ms. Vance rejected. Some time passed, and Ms. Vance again requested a refund. Respondent was only willing to refund $100, which Ms. Vance again rejected. The committee determined that respondent did not violate Rules 1.2 and 8.4(c) but did violate Rule 1.5(f)(6).
In the Bessie matter, the committee found that on April 1, 2004, Mr. Bessie paid respondent $794 in advance fees to handle his bankruptcy. At that time, respondent provided Mr. Bessie with bankruptcy documents to review and sign. Later that day, Mr. Bessie returned the documents to respondent and requested a full refund because he found another attorney to handle his bankruptcy. Respondent obviously had performed some work and agreed only to refund the $194 filing fee. The committee determined that respondent violated Rule 1.5(f)(6).
[14In the Melanie Williams matter, the committee found that respondent did not have an intimate relationship with Melanie while representing her in her divorce. However, he did have personal feelings for her during this time. The committee believed Dorman’s and Melanie’s testimony that respondent failed to communicate Dorman’s desire to reconcile to Melanie, obviously because of his feelings for Melanie and his desire to complete her divorce. Respondent’s feelings for Melanie clouded his judgment with respect to communications to be transmitted between the parties. Respondent was also providing Melanie with financial assistance when he filed the pauper motion on her behalf. However, this did not mean that she could not proceed in forma pauperis. The committee determined that respondent violated Rule 1.7(b) but did not violate Rule 3.8.
In the Neinstedt matter, respondent represented Mr. Neinstedt in a bankruptcy proceeding. Warren Williams purchased Mr. Neinstedt’s boat for $1,500 through the bankruptcy trustee. Respondent put up the money for the boat purchase, but the boat was titled in Warren’s name. According to Warren, the boat was his boat that was purchased with a gift of money from respondent. The bankruptcy trustee, Martin Schott, testified that he knew of no restriction on an attorney acquiring an asset out of a bankruptcy client’s estate or funding such a purchase. Mr. Neinstedt testified that he was pleased with respondent’s services and satisfied with the boat’s purchase price. The committee determined that respondent did not violate Rule 8.4(c).
In the Warren Williams matter, Warren and respondent entered into an agreement to start a company called GZP, Inc. to acquire, own, and operate a video store. Respondent provided the funds to purchase the store and for cash flow for its first few months of operation. The articles of incorporation, which respondent prepared, named Warren as an officer of the company. There were no notes or other agreements executed to reflect the type of arrangement that existed between 1^respondent and Warren. When their relationship deteriorated, respondent filed a lawsuit seeking to exercise his rights as part owner of the business. Because of the substantial amount of money that respondent put into the business, respondent believed he would be repaid if the store operation became profitable. Respondent ultimately dismissed the lawsuit, and true ownership was never proven. During the litigation process, respondent communicated directly with Warren on one occasion even though he was aware Warren was represented by counsel. The committee determined that respondent violated Rule 4.2 but did not violate Rule 8.4(c).
*856 In the tax matters, the committee found that respondent failed to timely pay personal income taxes; failed to timely file employment tax returns and to remit unemployment tax payments to the State of Louisiana; and failed to remit withholding and FICA taxes withheld from his employees. Respondent admitted that he had trouble paying his taxes and his accounts were garnished for the payment of those taxes. However, there was no testimony to prove dishonesty, fraud, deceit, or misrepresentation by respondent. The committee determined that respondent did not violate Rule 8.4(c) in the tax matters.
In the Porche matter, the committee found that respondent paid Ms. Porche with checks from his client trust account, using his personal funds that he placed in the account. There is no allegation or proof that respondent converted client funds in making these payments. However, respondent did commingle personal funds with client funds in his client trust account, in violation of Rule 1.15(a).
The committee determined that respondent acted negligently and knowingly. Relying upon the ABA’s Standards for Imposing Lawyer Sanctions, the committee determined the baseline sanction to be a period of suspension. Aggravating factors are a dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, and | ^substantial experience in the practice of law (admitted 1976). The committee found no mitigating factors.
Under all the circumstances, the committee recommended that respondent be suspended from the practice of law for one year and one day.
Both respondent and the ODC objected to the hearing committee’s report and recommendation.

Disciplinary Board Recommendation

Upon review of the record, the disciplinary board made the following findings:
In the Kibby matter, the board accepted the hearing committee’s factual findings. Based on those findings, the board determined that respondent violated Rules 1.3 and 1.4 of the Rules of Professional Conduct.
In the Osborne matter, the board agreed with the committee’s findings that respondent violated Rule 1.3 by failing to modify Ms. Osborne’s bankruptcy plan but did not violate Rule 1.4.
In both the Modeliste and King matters, the board determined that respondent violated Rule 1.15(a) by failing to deposit the advance filing fees in his client trust account.
In both the first and second commingling matters, the board agreed with the committee that respondent violated Rule 1.15(a) by depositing personal funds into his client trust account.
In the Cummings, Vance, and Bessie matters, the board adopted the committee’s factual findings and agreed that in each instance, respondent violated Rule 1.5(f)(6) by failing to place disputed funds into his client trust account and failing to provide his clients with an accounting.
li7In the Melanie Williams matter, the board agreed with the committee that respondent engaged in a conflict of interest in violation of Rule 1.7(b) but also determined that respondent violated Rule 3.3 by failing to act with candor toward a tribunal when he provided incomplete information to the court in the motion to proceed in forma pauperis.
In the Neinstedt matter, the board found no error in the committee’s findings and conclusions, agreeing that respondent did not violate Rule 8.4(c).
*857 In the Warren Williams matter, the board found that the committee’s findings and conclusions are not manifestly erroneous. Accordingly, the board agreed that respondent violated Rule 4.2 but did not violate Rule 8.4(c).
In the tax matters, the board determined that the committee erred in finding no proof of dishonesty, fraud, deceit, or misrepresentation by respondent. Citing In re: Wittenbrink, 03-0425 (La.6/27/03), 849 So.2d 18, the board observed that this court has found a lawyer’s failure to remit funds withheld from employees and failure to pay personal taxes involve elements of dishonesty, fraud, deceit, and misrepresentation in violation of Rule 8.4(c).
In the Porche matter, the board agreed with the committee that respondent violated Rule 1.15(a) by placing his personal funds into his client trust account to pay Ms. Porche. The ■ board also found that respondent violated Rule 8.4(c) when he underreported Ms. Porehe’s income for the year 1997.
Based on the above findings, the board determined that respondent violated duties owed to his clients, the legal system, the public, and the profession. His conduct was negligent in some instances and knowing in others. He caused potential harm to many of his clients and actual harm to Melanie Williams. Relying on the ABA’s Standards for Imposing Lawyer Sanctions, the board determined that the applicable baseline sanction is a period of suspension. The board also agreed with|1sthe aggravating factors found by the committee and found the sole mitigating factor to be the absence of a prior disciplinary record.
Indicating that “when all of the various acts of misconduct are considered together, in particular, respondent’s pattern of misuse of his trust account and his pattern of failing to meet fiscal obligations, along with the aggravating factors, an upward deviation to disbarment is appropriate,” the board recommended that respondent be disbarred.
Both respondent and the ODC filed objections to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
DISCUSSION
Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass’n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee’s factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
We find the hearing committee’s factual findings, as modified by the disciplinary board, are supported by the record. These findings establish that respondent neglected legal matters, failed to communicate with his clients, failed to refund unearned fees, failed to place disputed funds in trust, failed to provide account-ings to his clients, engaged in conduct constituting a conflict of interest, | ^commingled client funds with his own personal funds, demonstrated a lack of candor toward a tribunal, communicated with a person he knew to be represented by counsel, and engaged in dishonest and deceitful conduct, all in violation of Rules *858 1.3, 1.4, 1.5(f)(6), 1.7(b), 1.15(a), 3.3, 4.2, and 8.4(c) of the Rules of Professional Conduct.
Having found evidence of professional misconduct, we now turn to a determination of the appropriate sanction for respondent’s actions. In considering that issue, we are mindful that disciplinary-proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct. Louisiana State Bar Ass’n v. Reis, 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass’n v. Whittington, 459 So.2d 520 (La.1984).
Respondent’s conduct violated duties owed to his clients, to the public, to the legal system, and as a professional. His conduct was negligent in some instances and knowing in others, and caused both actual and potential harm. The applicable baseline sanction is a period of suspension.
The record supports the following aggravating factors: dishonest or selfish motive, a pattern of misconduct, multiple offenses, refusal to acknowledge the wrongful nature of the conduct, vulnerability of the victims, and substantial experience in the practice of law (admitted 1976). In mitigation, we recognize that respondent has no prior disciplinary record.
As ably noted by the disciplinary board in its report, our prior jurisprudence indicates that each of respondent’s acts of misconduct, standing alone, would not generally warrant discipline greater than a suspension from the practice of law. Indeed, in some instances, most notably in the case of a lawyer’s failure to attend to 12phis tax obligations, we have been inclined to impose a relatively short period of suspension, with all or part deferred. While these cases persuade us that respondent’s misconduct as a whole simply does not warrant the harsh sanction of disbarment which was recommended by the board, the significant aggravating factors present in this case likewise convince us that the year and a day suspension recommended by the hearing committee is too lenient. Rather, we believe the appropriate sanction in this case lies between these two extremes.
Based on this reasoning, we will impose upon respondent a suspension from the practice of law for three years. We will also require that respondent furnish complete accountings to his clients subject of the formal charges, and make full restitution of all unearned legal fees.
DECREE
Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Stephen King Peters, Louisiana Bar Roll number 10471, be and he hereby is suspended from the practice of law for a period of three years. Respondent is ordered to furnish complete ac-countings and full restitution of all unearned legal fees to his clients subject of the formal charges. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
KIMBALL and VICTORY, JJ., dissent and would disbar respondent.
KNOLL, J., dissents and assigns reasons.

. Respondent stipulated to the facts during his testimony at the formal hearing.

. On January 31, 2003, respondent deposited the $600 disputed fee into his client trust account. The ODC has since referred the fee issue to the Louisiana State Bar Association’s ("LSBA”) fee dispute resolution program.

. On August 29, 2003, respondent deposited the $600 disputed fee into his client trust account. The ODC has since referred the fee issue to the LSBA’s fee dispute resolution program.

. The extent of the relationship between respondent and Melanie is unclear. At oral argument, respondent denied that the relationship was sexual in nature; however, during his sworn statement, respondent testified that on one occasion there was “a sexual encounter” which was "physical in a sexual sense.” For her part, Melanie denied that her relationship with respondent went beyond kissing at a Christmas party in 1995.

. Respondent filtered all of these monetary gifts through his client trust account, apparently to keep them hidden from his wife and because his personal accounts were subject to seizure to satisfy the substantial tax liabilities he owed to the state and federal governments. Respondent also prepared and executed a will dated May 10, 1996 in which he bequeathed his "entire disposable estate” to his "dear friend” Melanie, and wrote her a letter on May 13, 1996 in which he promised to send her "a check every month.”

.Respondent had Warren’s other sister, Johanna Porche, who worked for respondent at the time, contact the bankruptcy trustee to negotiate a purchase price. Ms. Porche negotiated a price of $1,500 but made the trustee believe she was negotiating on behalf of her brother and not respondent.

.Martin Schott, the bankruptcy trustee, testified that he did not think respondent had violated any bankruptcy laws or regulations if he, in fact, was the actual purchaser. However, had it been disclosed that respondent was the actual purchaser, Mr. Schott would have evaluated the sales price more closely because respondent, as Mr. Neinstedt's attorney, was involved in listing the value of the boat on the bankruptcy schedules.

. Respondent was never listed as an incorpo-rator, owner, registered agent, director, or officer of GZP, Inc.

. As previously noted, Johanna also worked for respondent. She claimed that respondent became obsessed with her during the time she worked for him, and consequently, she left his employment. She claimed that thereafter respondent stalked and harassed both her and her family.

. Respondent regularly maintained a staff of two to four employees in his law practice.