ATTORNEY DISCIPLINARY PROCEEDINGS
 

 PER CURIAM.
 
 *
 

 11
 
 This disciplinary matter arises from formal charges filed by the Office of Disciplinary Counsel (“ODC”) against respondent, Wade R. Baggette, an attorney licensed to practice law in Louisiana.
 

 UNDERLYING FACTS
 

 The underlying facts of this matter are extremely complex. By way of background, Helen Smith Fuller (hereinafter referred to as “Helen”) died intestate in May 1976, survived by her daughter and only heir, Jo Anne Fuller (“Jo Anne”). Jo Anne administered some of the properties that had belonged to her mother but did not open her mother’s succession. Jo Anne, who had never been married and had no children, died intestate on January 20, 1984. She was survived by one maternal aunt, Elizabeth Smith Collins (“Mrs. Collins”), age 76, and two paternal aunts, Annie Mae Fuller Anderson (“Mrs. Anderson”), age 84, and Clara Fuller To-bin (“Mrs. Tobin”), age 87.
 
 [1]
 
 Mrs. Anderson and Mrs. Tobin were also the great aunts of respondent’s wife. Mrs. Tobin died testate in August 1985. Her legatees consisted of respondent, his wife, and his wife’s parents.
 

 \2Succession of Jo Anne Fuller
 

 On January 25, 1984, five days after Jo Anne’s death, Mrs. Anderson and Mrs. Tobin retained respondent to represent them in connection with Jo Anne’s succession. Mrs. Anderson also granted respondent a general power of attorney to handle her affairs. On that same day, upon the nomination of Mrs. Anderson and Mrs. Tobin, respondent was appointed the provisional administrator of Jo Anne’s succession. He served in that capacity until October 31, 1984, at which time the maternal aunt, Mrs. Collins, was appointed ad-ministratrix.
 
 [2]
 

 
 *100
 
 Mrs. Anderson and Mrs. Tobin also nominated respondent to be the administrator of Helen’s succession. Respondent was appointed to that position in March 1984. Mrs. Collins thereafter petitioned for respondent’s removal, claiming that he was not qualified to serve as administrator under the Louisiana Code of Civil Procedure. This effort by Mrs. Collins was unsuccessful,
 
 [3]
 
 and for a time Helen’s and Jo Anne’s successions proceeded in tandem with separate administrators.
 

 In 1986, respondent petitioned the trial court for approval to sell all of the property of Helen’s succession at private sale.
 
 [4]
 
 The sales price was $180,000, with respondent and his wife, his wife’s parents, and Mrs. Anderson named as buyers. Mrs. Collins opposed the sale. In early January 1990, the trial court ruled that the
 
 pro _]£uta
 
 sale would be permitted.
 
 [5]
 
 Respondent, his wife, and in-laws were to receive a total of one-third of the property for $60,000.
 
 [6]
 
 However, on January 12, 1990, before the sale could take place, this court consolidated the assets of Helen’s succession into Jo Anne’s succession.
 
 [7]
 
 This action ended respondent’s tenure as administrator of Helen’s succession, and left Mrs. Collins as administratrix of the consolidated successions.
 

 The administration of Jo Anne’s estate was complicated by tax problems. First, Jo Anne had failed to file income tax returns in the years prior to her death. On October 29, 1984, the IRS filed a proof of claim in Jo Anne’s succession showing that Jo Anne owed over $1 million in unpaid income taxes. On January 8, 1990, Mrs. Collins and respondent received a notice of levy from the IRS, seizing all the property of Jo Anne’s and Helen’s successions to satisfy the income tax obligation owed by Jo Anne. At that time, Jo Anne owed $1.65 million in unpaid income taxes, penalties,
 
 *101
 
 and interest.
 
 [8]
 

 ^Furthermore, the succession was at odds with the IRS over estate taxes. On April 14, 1988, the IRS notified Mrs. Collins of a $4.45 million deficiency in the estate tax liability of the Estate of Jo Anne Fuller. The IRS had placed a much higher value on the estate property than had Mrs. Collins when she filed the estate tax return.
 
 [9]
 
 The major asset in question was four promissory notes given to Jo Anne by an Arkansas physician, David Newbern. Although the estate ascribed a discounted value of $230,000 to the four “Newbern notes,” the face value of the notes was actually $4,910,000. It was the face value of the notes, plus other adjustments in the estate tax paid by Jo Anne’s succession, which formed the basis of the $4.45 million deficiency assessment.
 

 At the same time, the Newbern notes were the subject of a lawsuit filed in February 1988 by respondent, his wife, his in-laws, and Mrs. Anderson against Mrs. Collins and her attorneys, the Shreveport law firm of Cary & Cary.
 
 [10]
 
 The plaintiffs alleged that Mrs. Collins and her attorneys had allowed the Newbern notes to prescribe and breached other fiduciary duties as administratrix of Jo Anne’s succession. On April 20, 1988, an Arkansas court agreed that the Newbern notes were prescribed and were not furnished for consideration. On July 14, 1988, attorney John Luffey, Jr., the tax counsel for Jo Anne’s estate, filed a petition in the United States Tax Court contesting the estate tax deficiency. Among other contentions, Mr. Luffey asserted that no value should be given to the Newbern notes among the assets of the estate.
 

 Notwithstanding the position taken by Mr. Luffey in the Tax Court, respondent counseled his client, Mrs. Anderson, against accepting the assets of Jo Anne’s |succession. Respondent told Mrs. Anderson that with interest and penalties, the estate tax liability was $8.5 million, far in excess of her interest in the estate. The ODC contends that respondent intentionally and artificially overstated the estate tax liability so that he could acquire the succession assets for himself at a fraction of their fair market value, and that there was not a significant risk that the IRS would ever assess $8.5 million in estate taxes.
 

 Meanwhile, respondent was working to amicably resolve the issues with the IRS and Mrs. Collins. By January 1990, respondent had proposed that he purchase the assets of Jo Anne’s estate, but the IRS agent in charge of collecting the income taxes, Winfred Weldon, informed respondent that the IRS would not support his proposal unless the purchase price would fully pay the outstanding income taxes. However, Mr. Weldon explained, the payment of the income taxes would have a “very positive impact upon the estate taxes owed by Jo Anne Fuller,” as the payment in full of the income taxes “will negate most if not all, the estate taxes owing by
 
 *102
 
 both estates.”
 
 [11]
 

 On March 28, 1990, respondent and Mrs. Collins entered into a confidential settlement whereby Mrs. Collins agreed to sell respondent the entirety of the succession assets, on the condition that respondent assume liability for the payment of the taxes.
 
 [12]
 
 With regard to the estate taxes, the settlement agreement provided that the claim “shall be settled as to the amount of the obligation by closing. IRS may not necessarily be paid any remaining estate tax at that time, because the new administration may elect to pay such remaining tax pursuant to the provisions of IRC | (i6166 or other relief provisions (including 6161). However, the
 
 obligation
 
 shall be determined and fixed by closing, so that it will be known to Buyer [respondent].” [Emphasis in original.] On April 16, 1990, respondent wrote a letter to Mrs. Collins’ attorney in which he stated, with regard to the estate tax, “We have that almost settled.”
 

 On April 30, 1990, the closing of the sale of the succession assets by Mrs. Collins to respondent took place. Respondent paid Mrs. Collins the sum of $397,000 for her interest in the two successions,
 
 [13]
 
 plus a $125,000 fee for her services as administra-trix. In order to finance the transaction with Mrs. Collins, and to pay the income and estate taxes owed to the IRS, respondent borrowed funds from, among other sources, his client, Mrs. Anderson. In March 1990, respondent transferred $600,000 from two bank accounts in Mrs. Anderson’s name to Auburn Corporation (“Auburn”), a closely-held corporation he created expressly for the purpose of acquiring the succession property. Respondent and his wife are the sole shareholders of Auburn.
 
 [14]
 
 In consideration of the transfer of funds, respondent executed a $600,000 promissory note on behalf of Auburn in favor of Mrs. Anderson.
 
 [15]
 
 The particulars of the transaction are not memorialized in any documents or memoran-da executed or acknowledged by Mrs. Anderson indicating her awareness or authorization of the “loan.” Moreover, respondent did not advise Mrs. Anderson to seek independent advice regarding the consequences of entering into a business transaction with her lawyer.
 

 |7On May 2, 1990, respondent sent a report to Mr. Weldon in which he advised that he had obtained a commitment from the bank for the financing to pay the income taxes, and had “tentatively settled the estate tax with Gus Marcotte [the estate tax auditor], at least in principle. We know approximately what the final figure will be, so that I can plan my financing. I am relying on Gus as to the estate tax figure.”
 

 
 *103
 
 Following the execution of the settlement documents with Mrs. Collins, respondent and Mrs. Collins filed a joint petition seeking the approval of the trial court to sell the succession assets to respondent or his designee, Auburn. The petition was granted.
 
 [16]
 
 Respondent then paid the income taxes owed to the IRS, approximately $1.65 million, and completed the negotiations to resolve the estate tax claim.
 

 In December 1990, the IRS acquiesced in Mr. Luffey’s contention that no value should be given to the Newbern notes among the assets of the estate, and a stipulation was filed in the Tax Court reducing the value of Jo Anne’s taxable estate by $4,910,000. In January 1993, the United States Tax Court formally accepted the stipulation of the parties. The effect of the stipulation was that no estate taxes were paid by Jo Anne’s succession; rather, the succession was actually due a
 
 refund
 
 of estate taxes in the amount of $172,328.22. The refund was paid to Auburn.
 

 Once the assets of the successions were owned by Auburn free and clear of any tax liens, respondent transferred 70,000 shares of bank stock to himself and then transferred all of the remaining assets to his wife via a series of
 
 dations en paiement
 

 [17]
 

 |sThe ODC alleges that these transactions were designed to place the property beyond the legal reach of heirs seeking to rescind the transfers; however, respondent denies this allegation. Rather, respondent suggested that he transferred the bank stock to himself in order that Auburn would not be considered a bank holding company,
 
 [18]
 
 and that the transactions involving his wife were designed solely “to get the properties out of the corporation” in order that Auburn would not have to pay some $5,000 in annual franchise taxes.
 

 Succession of Annie Mae Fuller Anderson
 

 In February 1994, Mrs. Anderson died, and respondent’s wife, Nancy, was appointed executrix of the succession.
 
 [19]
 
 Respondent served as counsel for the executrix. Soon after her appointment, Mrs. Baggette was discharged as executrix, and Mrs. Anderson’s nephew, James Roy Fuller, Jr., was appointed dative testamentary executor.
 
 [20]
 
 In 1996, Mr. Fuller filed suit
 
 *104
 
 against respondent, his wife, and Auburn.
 
 [21]
 
 Among other allegations, Mr. Fuller claimed that respondent defrauded Mrs. Anderson of her inheritance of one-third of the assets belonging to the successions of both Helen and Jo Anne. Mr. Fuller further alleged that respondent, as legal representative of the successions, illegally and fraudulently conveyed succession assets to Auburn for prices far below their fair market value, and | nthat in doing so, he breached his fiduciary duty to protect and preserve the succession assets. Mr. Fuller also asserted that respondent fomented years of litigation in the two successions and frustrated Mrs. Collins’ attempts to administer Jo Anne’s succession as part of a concerted scheme to gain control and ownership of the property belonging to Helen’s and Jo Anne’s successions.
 

 In response to the petition, respondent filed the exceptions of prescription and peremption. Ultimately, the trial court granted the exception of prescription and dismissed all of Mr. Fuller’s claims against respondent in his capacity as administrator of Jo Anne’s succession, and all of Mr. Fuller’s claims against respondent in his capacity as administrator of Helen’s succession after January 12, 1990. However, the court of appeal reversed, finding that Mr. Fuller’s suit against respondent was timely.
 
 [22]
 

 The
 
 Fuller
 
 case was then set for trial. After several continuances of the matter, the suit settled in March 2007 when respondent agreed to pay $1.1 million to Mrs. Anderson’s heirs.
 

 DISCIPLINARY PROCEEDINGS
 

 In 2003, after the Second Circuit Court of Appeal issued its opinion in
 
 Fuller v. Baggette,
 
 the ODC initiated an investigation into respondent’s conduct in this matter. In August 2006, the ODC filed one count of formal charges against respondent. Although numerous rule violations are set forth in the formal charges, the focus of this proceeding is upon Rule 1.8(a) of the Rules of Professional Conduct, which at the time of the alleged misconduct provided:
 

 A lawyer shall not enter into a business transaction with a client or knowingly acquire an ownership, possessory, | i0security or other pecuniary interest adverse to a client unless:
 

 (1) The transaction and terms on which the lawyer acquires the interest are fair and reasonable to the client and are fully disclosed and transmitted in writing to the client in a manner which can be reasonably understood by the client;
 

 (2) The client is given a reasonable opportunity to seek the advice of independent counsel in the transaction; and
 

 (3) The client consents in writing thereto.
 

 Following the filing of the formal charges, respondent, through counsel, filed a motion to stay the disciplinary proceedings pending the conclusion of the civil suit against him by Mr. Fuller. The ODC objected to the motion to stay. In November 2006, the hearing committee granted respondent’s motion and stayed the matter “until two weeks following the close of the trial” of the
 
 Fuller
 
 suit, or until March 15, 2007, whichever occurred earlier. The hearing committee further ordered that respondent would be required to file an answer to the formal charges at that time.
 

 
 *105
 
 On April 11, 2007, following the settlement in
 
 Fuller,
 
 respondent filed an answer to the formal charges in which he denied any violation of the Rules of Professional Conduct. However, in his pre-hearing memorandum, respondent conceded that he “did not provide [Mrs. Anderson] a written document fully disclosing the terms on which the assets of the consolidated successions were being acquired and [Mrs. Collins’] interest was being purchased nor was [Mrs. Anderson’s] consent to these matters obtained in writing,” in violation of Rule 1.8(a).
 

 Hearing Committee Report
 

 This matter proceeded to a formal hearing on the merits. After considering the evidence and testimony presented at the hearing, the hearing committee found that the underlying facts are largely not in dispute. Rather, the differences of opinion between | nthe parties relate almost exclusively to respondent’s motive for undertaking the actions in question. The committee’s factual findings include the following:
 

 1. On January 25, 1984, Mrs. Tobin and Mrs. Anderson retained respondent to represent them in Jo Anne’s succession. Both also executed general powers of attorney in favor of respondent. At the time these documents were executed and on numerous occasions thereafter, both Mrs. Tobin and Mrs. Anderson told respondent and his wife, Nancy Baggette, that they did not want any immovable property and bank stock owned in indivisión by members of the extended Fuller family to be sold to anyone outside the family.
 

 2. Respondent was appointed as provisional administrator of Jo Anne’s succession and served in that capacity until October 31, 1984. The succession was extremely complex, having numerous assets of all kinds, including a large amount of immovable property, but also large debts, including both income and estate taxes owed to the federal government. Jo Anne had not paid income taxes during the last years of her life.
 

 3. Respondent was also appointed administrator of Helen’s succession and administered the assets of that succession until the Louisiana Supreme Court consolidated Helen’s and Jo Anne’s successions on January 12, 1990.
 

 4. On August 5, 1985, Mrs. Tobin died testate, naming respondent, Mrs. Bag-gette, and Mrs. Baggette’s parents, George and Eloise Wiggers, as universal legatees.
 

 5. From November 1, 1984, when she qualified as administratrix, until her resignation on April 19, 1990, Mrs. Collins served as the representative of Jo Anne’s succession, and after the January 12, 1990 consolidation she also administered the assets of Helen’s succession.
 

 1126. On March 4, 1987, while in the possession of Mrs. Collins’ attorneys, Cary & Cary in Shreveport, promissory notes having a face value of $4,910,000 signed by an Arkansas physician, Dr. Newbern, in favor of Jo Anne prescribed. The “Newbern notes” were discovered after Jo Anne’s death. Whether they ever had any value is debatable. Regardless, the IRS included them as a significant asset of Jo Anne’s estate.
 

 7. On February 24, 1988, respondent, his wife, and in-laws and Mrs. Anderson sued Mrs. Collins and Cary & Cary for damages as a result of the prescribed Newbern notes.
 

 8. On April 14, 1988, a statutory notice of deficiency in the amount of $4,445,222 was served on Mrs. Collins for estate
 
 *106
 
 taxes (plus interest) and attorney John Luffey was retained to file suit in Tax Court to contest this assessment.
 

 9. The Fuller heirs, consisting of Mrs. Anderson, respondent, his wife, and in-laws, agreed to a pro rata purchase of the assets of Helen’s succession for a total sales price of $120,000, and the right was accorded Mrs. Collins to purchase her one-third of those assets for $60,000, the total sales price being $180,000. On January 3, 1990, after all legal delays and meeting all requirements, a judgment homologating the application for authority to make the pro rata sale to the heirs was rendered by a judge of the Fourth Judicial District Court.
 

 10. All assets of both Helen’s and Jo Anne’s successions were seized on January 10, 1990 by the IRS for past-due income taxes plus interest and other assessments which eventually required payment of $1,711,881.18.
 

 11. Cary & Cary, on behalf of Mrs. Collins, retained Arkansas counsel to sue Dr. Newbern on the prescribed notes in the Circuit Court of Pulaski County, ^Arkansas. This resulted in an adverse judgment decreeing the notes time barred and furnished for no consideration.
 

 12. Shortly after the seizure of the assets of the consolidated successions, the IRS, through its agent in charge, Winfred Weldon, contacted respondent and Mrs. Collins’ new attorney, William Ledbetter, with demands for payment of the income tax obligation. Mr. Weldon informed Mr. Ledbetter and respondent that the IRS intended to sell all assets of the succession, and both respondent and Mrs. Collins were warned of their personal liability for paying debts in preference to the taxes owed.
 

 13. Extensive negotiations among and between respondent and the other heirs of Mrs. Tobin, Mrs. Anderson, the IRS, and Mrs. Collins resulted in an agreement whereby the assets of the consolidated successions were sold to respondent or his designee on the condition that he personally assume the obligation of paying all debts, charges, fees and expenses of both successions due and/or necessary to complete administration of the consolidated successions, including all federal income and estate taxes.
 

 14. The terms of this settlement were explained by Mr. Baggette to Mrs. Baggette, Mr. Wiggers, a sister-in-law, and Mrs. Anderson, but only Mrs. Baggette elected to participate in the purchase.
 

 15. Pursuant to the agreement, Mrs. Collins and respondent filed a series of petitions seeking authority to sell the assets of the consolidated successions, the terms of the sale being fully set out as required by law. After due advertisement in all parishes where immovable property being sold was located, as well as in Ouachita Parish, in which the probate proceeding was pending, no opposition was filed and with the lapse of legal delays, judgment homologating the petitions was rendered by the probate court.
 

 |1416. Meanwhile, as agreed, Mrs. Collins sold her interest in both successions to a corporation wholly owned by respondent and his wife and resigned as administratrix of Jo Anne’s succession. Mutual releases were given by Mrs. Collins on the one hand and Mrs. Anderson, respondent, Mrs. Baggette, respondent’s father-in-law and sister-in-law, on the other. Mrs. Collins was
 
 *107
 
 dismissed from the lawsuit and an indemnity and “hold harmless” clause in her favor was granted.
 

 17. To obtain the funds needed for the settlement, the Baggettes borrowed $700,000 from Louisiana Bank, and Mrs. Baggette borrowed $600,000 from Mrs. Anderson, giving an interest bearing promissory note to her aunt. The obligation in principal and interest to Mrs. Anderson was fully paid on April 1,1993.
 

 18. Respondent and his wife were very involved in the care of Mrs. Anderson and management of her affairs in her later years. After her death, there ensued a contest over two wills executed by Mrs. Anderson (a statutory will dated November 21, 1984 and an olographic will dated July 22, 1986), after which the olographic will was upheld and James Fuller, a nephew of Mrs. Anderson, was appointed executor of Mrs. Anderson’s estate by order dated June 3,1994.
 

 19. In 1996, Mr. Fuller filed suit against respondent for breach of fiduciary duty. This suit was settled in 2007.
 

 Based on these factual findings, the committee found that respondent violated Rule 1.8(a) by not providing Mrs. Anderson with a written document fully disclosing the terms in which the assets of the consolidated successions were being acquired and Mrs. Collins’ interest was being purchased, and not obtaining Mrs. Anderson’s consent to these matters in writing. The committee found an additional violation of 11fiRule 1.8(a) stemming from the $600,000 loan, but noted that no actual harm was done to Mrs. Anderson in connection with the loan.
 

 The committee further found that respondent did not breach his fiduciary duty as a succession representative in purchasing property belonging to Jo Anne’s succession. At the time of the purchase respondent and his wife were heirs by representation as legatees of Mrs. Tobin, and as such were specifically allowed by the Louisiana Code of Civil Procedure to acquire the property of Jo Anne’s succession.
 
 [23]
 
 Additionally, the committee found that the acquisition was motivated by the heirs’ insistence that the property not be sold outside the family, and the “very real threat of the unpaid taxes which were due on the succession property.” The committee specifically concluded that “the threat to the estate by the Internal Revenue Service was real and not something ‘trumped up’ by Respondent. ... The ODC presented no | mproof that Respondent planned the out
 
 *108
 
 come or somehow knew the estate tax liability would disappear and the succession .property would greatly increase in value.”
 

 The committee found that the applicable baseline sanction for respondent’s misconduct is suspension. In aggravation, the committee found the following factors: vulnerability of the victim and substantial experience in the practice of law (admitted 1981). The committee found the following mitigating factors: absence of a prior disciplinary record, absence of a dishonest or selfish motive, and personal or emotional problems.
 
 [24]
 
 The committee also noted in mitigation that respondent has “admitted the technical violations of [Rule] 1.8(a) discussed above.”
 

 Considering all these circumstances, the committee recommended that respondent be suspended from the practice of law for eighteen months, with six months deferred, followed by a six-month period of probation.
 

 Both respondent and the ODC objected to various aspects of the hearing committee’s report and recommended sanction. Respondent took issue with the hearing committee’s failure to find several mitigating factors which he maintained apply in this case and argued that the sanction recommended by the committee is too harsh. Respondent suggested that the appropriate discipline is a fully deferred period of suspension, subject to probation. The ODC objected to the committee’s factual findings and legal conclusions and argued that the appropriate sanction in this case is disbarment.
 

 Disciplinary Board Recommendation
 

 After review, the disciplinary board found that the hearing committee’s factual findings are manifestly erroneous in several respects. In particular, the committee | l7found that to obtain the funds needed for the settlement, the Baggettes borrowed $700,000 from the bank and Mrs. Baggette borrowed $600,000 from Mrs. Amderson, giving an interest bearing promissory note to her aunt. The board found the committee failed to point out that initially
 
 Auburn,
 
 not Mrs. Baggette, borrowed the money from Mrs. Anderson. Auburn was the closely-held corporation of respondent and Mrs. Baggette. Three days after the initial note was executed by respondent on behalf of Auburn, the note was paid in full and then Mrs. Baggette executed a $600,000 promissory note in favor of Mrs. Anderson for the loan.
 

 The board agreed with the committee that respondent violated Rule 1.8(a) of the Rules of Professional Conduct. Respondent violated this rule when he, through Auburn, acquired Mrs. Anderson’s interest in the consolidated succession assets without transmitting the terms of the sale to Mrs. Anderson in writing and without giving her reasonable opportunity to seek the advice of independent counsel. He also failed to obtain Mrs. Anderson’s written consent to the transaction. He further violated the rule when he, through Auburn, borrowed $600,000 from Mrs. Anderson to purchase the assets of the consolidated estate while representing her in Jo Anne’s succession. He again failed to comply with the requirements of the rule by failing to memorialize the terms and conditions of the loan agreement in writing, by failing to advise her to seek the advice of independent counsel and by failing to have her consent to the terms of the agreement in writing. Interestingly, as to the loan, respondent could not testify with
 
 *109
 
 certainty that he had actually discussed the terms of the loan with Mrs. Anderson. He instead suggested that his wife had handled the negotiations with Mrs. Anderson, who was ninety years old at the time.
 

 In its brief to the board, the ODC argued that the committee erred by finding that the Code of Civil Procedure articles dealing with successions dispensed with respondent’s obligation to comply with the Rules of Professional Conduct governing | ^business transactions with a client and that his violation of Rule 1.8(a) was only a technical one. The board agreed with the ODC, reasoning that while La.Code Civ. P. arts. 3194 and 3195 allow for an heir to purchase assets of the succession while also functioning as the representative of the succession, the committee failed to fully account for the fact that during this time respondent also represented Mrs. Anderson in Jo Anne’s succession. As such, the dictates of Rule 1.8(a) were very much in effect, and respondent’s failure to follow the requirements of the rule when entering into the sale of the assets of the consolidated estates to Auburn, and when entering into a promissory note agreement with Mrs. Anderson through Auburn, resulted in a serious violation of the Rules of Professional Conduct — not just a “technical” violation as described by the hearing committee.
 

 The ODC also argued that the committee erred in finding that respondent possessed no dishonest or selfish motive in purchasing his client’s interest in the succession. This issue focuses on whether respondent knew, at the time of Auburn’s purchase of the assets of the consolidated estates, that the $8.5 million estate tax lien would be eliminated by the payment of the $1.65 million income tax liability. Although the committee found the ODC failed to prove its contention that the $8.5 million estate tax lien was illusory, the board found the ODC produced clear and convincing evidence that respondent did not believe, at the time of the sale, that the $8.5 million estate tax was actually going to be imposed by the IRS.
 

 The board determined that respondent violated duties owed to his client, Mrs. Anderson. Respondent’s conduct was knowing and intentional. The amount of actual injury was substantial. Mrs. Anderson’s heirs were required to sue respondent and others to obtain their portion of Mrs. Anderson’s succession rights that were sold to Auburn. The board determined that the baseline sanction for this misconduct is | |9disbarment, citing Standard 4.31 of the ABA’s
 
 Standards for Imposing Lawyer
 
 Sanctions,
 
 [25]
 

 The board found the following aggravating factors apply: a dishonest or selfish motive, vulnerability of the victim, and substantial experience in the practice of law. In mitigation, the board recognized the following factors: absence of a prior disciplinary record and personal or emotional problems (family dispute over estate property).
 

 Finding that respondent disregarded his professional obligations to Mrs. Anderson and caused great harm to her heirs, the board recommended that respondent be disbarred.
 

 Respondent filed an objection to the disciplinary board’s recommendation. Accordingly, the case was docketed for oral
 
 *110
 
 argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).
 

 DISCUSSION
 

 Bar disciplinary matters fall within the original jurisdiction of this court. La. Const, art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence.
 
 In re: Quaid,
 
 94-1316 (La.11/30/94), 646 So.2d 343;
 
 Louisiana State Bar Ass’n v. Boutall,
 
 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard 12pis applicable to the committee’s factual findings.
 
 See In re: Caulfield,
 
 96-1401 (La.11/25/96), 683 So.2d 714;
 
 In re: Pardue,
 
 93-2865 (La.3/11/94), 633 So.2d 150.
 

 Respondent has admitted his violation of Rule 1.8(a) of the Rules of Professional Conduct. Therefore, the only issue we must resolve is the appropriate sanction in this case. In considering that issue, we are mindful that disciplinary proceedings are designed to maintain high standards of conduct, protect the public, preserve the integrity of the profession, and deter future misconduct.
 
 Louisiana State Bar Ass’n v. Reis,
 
 513 So.2d 1173 (La.1987). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved considered in light of any aggravating and mitigating circumstances.
 
 Louisiana State Bar Ass’n v. Whittington,
 
 459 So.2d 520 (La.1984).
 

 Respondent violated Rule 1.8(a) in two respects: first, he borrowed $600,000 from his elderly client, Mrs. Anderson, without disclosing the terms of the transaction to her in writing (or at all, for that matter), without giving her a reasonable opportunity to seek the advice of independent counsel, and without obtaining her written consent to the transaction. Second, at the time that respondent entered into an agreement to purchase Mrs. Anderson’s interest in Helen’s and Jo Anne’s successions, he did not disclose the terms of the transaction to her in writing, did not give her a reasonable opportunity to seek the advice of independent counsel, and did not obtain her written consent to the transaction. These are not mere “technical” violations of Rule 1.8(a), as found by the hearing committee. More disturbingly, the record supports a finding that respondent acted intentionally and with a dishonest motive. The documentary evidence suggests that at the time respondent purchased his client’s interest in the successions, he did not believe that the $8.5 million estate tax would actually be imposed by the IRS. In fact, Jo Anne’s succession eventually |21collected a refund of the estate taxes it had already paid. By this time, however, respondent’s closely-held corporation, Auburn, already owned the succession assets.
 

 We agree with the board that under these facts, the applicable baseline sanction is disbarment. The aggravating factors present are a dishonest or selfish motive, vulnerability of the victim, and substantial experience in the practice of law (admitted 1981). In mitigation, respondent has no prior disciplinary record. Both the hearing committee and the board credited respondent with personal and emotional problems, and the board specifically identified that these were due to his family dispute over the estate property. As respondent’s own actions were a contributing factor in that dispute, we give this no weight in mitigation.
 

 Under all the circumstances, no downward deviation from the baseline sanction
 
 *111
 
 is warranted in this case. Accordingly, we will accept the board’s recommendation and disbar respondent.
 

 DECREE
 

 Upon review of the findings and recommendations of the hearing committee and the disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Wade R. Baggette, Louisiana Bar Roll number 2652, be and he hereby is disbarred. His name shall be stricken from the roll of attorneys and his license to practice law in the State of Louisiana shall be revoked. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court’s judgment until paid.
 

 *
 

 Judge Benjamin Jones, of the Fourth Judicial District Court, assigned as Justice
 
 Pro Tem-pore,
 
 participating in the decision.
 

 [1]
 

 . The aunts were entitled to inherit a one-third interest each in Jo Anne's estate, the assets of which consisted of securities, personal movables, and immovable property located in seven parishes in north Louisiana.
 

 [2]
 

 . Respondent subsequently submitted a bill to Jo Anne’s succession for $170,000 in fees covering the nine months that he served as provisional administrator. He was ultimately awarded $27,000 for his services as administrator, plus $510 representing attorney's fees for services rendered after the conclusion of his duties as provisional administrator.
 
 See
 
 
 *100
 

 Succession of Fuller,
 
 501 So.2d 1017 (La.App. 2nd Cir.),
 
 writ denied,
 
 504 So.2d 881 (La.1987).
 

 [3]
 

 .
 
 See Succession of Fuller,
 
 480 So.2d 754 (La.App. 2nd Cir. 1985) (on rehearing),
 
 writ granted,
 
 482 So.2d 619 (La.1986).
 

 [4]
 

 . Respondent testified that he "had pretty well cleaned up" Helen's succession, paid all the taxes and debts and was ready to put the heirs in possession, but he did not want to put the property into Jo Anne's succession because he believed Mrs. Collins had administered Jo Anne’s estate into insolvency. Therefore, respondent believed "it would be better to try to arrange a pro rata sale to the heirs."
 

 [5]
 

 . In an earlier ruling, the trial court acknowledged that respondent’s proposal to sell all of the succession assets for $180,000 might seem "shocking” when considered in light of a previous pleading in which respondent indicated that the same property had a value of over $600,000. Nevertheless, the tidal court observed that Mrs. Collins, who opposed the sale, had not introduced any evidence of the actual fair market value of the property or of the existence of a willing third-party purchaser. Moreover, the trial court stated that it was convinced further administration of the succession would be detrimental to its successors, and that it believed the sale would bring about an earlier conclusion to the administration.
 

 [6]
 

 . In luis answer to the complaint filed in this matter, respondent freely admitted that the proposed sale "was most likely a bargain sale,” although under the circumstances he denied that his conduct constituted a conflict of interest. Rather, he suggested his plan was "creative, original and well-intentioned” and-was designed with "the objective of getting around the insolvent Succession of Jo Anne Fuller and putting at least some properly of the Fuller Estates into the hands of the heirs, even if they had to buy it, which they all agreed to do.... The $180,000 proceeds of the sale, less legal and administrative fees, would have been distributed by me to the Succession of Jo Anne Fuller.”
 

 [7]
 

 .
 
 Succession of Fuller,
 
 556 So.2d 47 (La.1990).
 

 [8]
 

 .The IRS did not immediately move to liquidate the assets of the estate to collect the income taxes, but soon threatened to do so when the parties could not negotiate a settlement to pay the taxes in full. Respondent contends that he simply could not abide by this fate as the Fullers have an "unwritten family rule” against selling their property outside the family unless all the family members consent. He suggests that this was the motivation for his conduct in this matter.
 

 [9]
 

 . The 1985 estate tax return filed by Mrs. Collins showed that the gross estate was worth $5,788,737 and that $644,097 was owed in estate taxes.
 

 [10]
 

 .
 
 Anderson v. Collins,
 
 No. 88-628 on the docket of the 4th Judicial District Court for the Parish of Ouachita.
 

 [11]
 

 . Mr. Weldon later explained that any income taxes paid by the succession would become a credit against the estate taxes due.
 

 [12]
 

 . Respondent also agreed to dismiss all claims brought against Mrs. Collins in the
 
 Anderson
 
 case. The confidential settlement agreement obliged Mrs. Collins to resign as the administratrix of Jo Anne's succession and to support respondent's application to be the successor administrator.
 

 [13]
 

 . The public records indicate that the sales price was $30,000, divided equally between the two successions. The true consideration paid by respondent to Mrs. Collins is reflected in an unrecorded counter letter executed by the parties on April 16, 1990.
 

 [14]
 

 . Respondent testified that he owns a 55% share in Auburn, and his wife owns the remaining 45% share.
 

 [15]
 

 . Respondent testified that this note was executed “in error,'' and that it had always been intended that the loan would be made by his wife. He testified that the loan by Auburn was paid in full within several days and replaced with a promissory note from his wife to Mrs. Anderson.
 

 [16]
 

 . The documents transferring the estate properties to respondent were recorded in the probate record but were not filed in the conveyance records until five years later. Respondent testified that there was a delay because he "didn't see any purpose in filing them in the conveyance records” when they were first executed.
 

 [17]
 

 . Following these transfers, Mrs. Baggette transferred the assets to two revocable trusts in her name. Respondent is the beneficiary of one trust; his son is the beneficiary of the other. Respondent testified that he set up the trusts purely as a "management device.”
 

 [18]
 

 . Respondent has since sold the bank stock for $5.5 million.
 

 [19]
 

 . Mrs. Anderson had executed a statutory will prepared by respondent in 1984, naming respondent as succession attorney and executor and his wife as alternate executrix. The will provided a total of $11,600 for memorials at two universities and for small legacies to certain nieces, nephews, great-nieces, and great-nephews, with the remainder of Mrs. Anderson's estate to six named universal legatees: respondent and his wife, respondent's in-laws, and two of Mrs. Anderson's nephews. However, in 1986, and unbeknownst to respondent, Mrs. Anderson executed an olo-graphic will revoking all prior wills and giving her entire estate to all of her nieces and nephews in equal portions. Respondent and his wife attempted to challenge the olographic will on grounds of undue influence, but they were not successful.
 

 [20]
 

 . See Succession of Anderson,
 
 26,947 (La. App. 2nd Cir.5/10/95), 656 So.2d 42,
 
 writ denied,
 
 95-1789 (La.10/27/95), 662 So.2d 3.
 

 [21]
 

 .
 
 James Roy Fuller, Jr., Executor of the Succession of Annie Mae Fuller Anderson v. Wade R. Baggette, Sr., et al.,
 
 No. 96-2561 on the docket of the 4th Judicial District Court.
 

 [22]
 

 .
 
 Fuller v. Baggette,
 
 36,952 (La.App. 2nd Cir.5/6/03), 847 So.2d 26,
 
 writ denied,
 
 03-2076 (La.11/7/03), 857 So.2d 498.
 

 [23]
 

 . See La.Code Civ. P. arts. 3194 and 3195, which provide in pertinent part as follows:
 

 Art. 3194. Contracts between succession representative and succession prohibited; penalties for'failure to comply
 

 A succession representative cannot in his personal capacity or as representative of any other person make any contracts with the succession of which he is a representative. He cannot acquire any property of the succession, or interest therein, personally or by means of third persons, except as provided in Article 3195....
 

 s}s ⅝ s[c
 

 Art. 3195. Contracts between succession representative and succession; exceptions The provisions of Article 3194 shall not apply when a testament provides otherwise or to a succession representative who is:
 

 (1) The surviving spouse of the deceased;
 

 (2) A partner of the deceased, with respect to the assets and business of the partnership;
 

 (3) A co-owner with the deceased, with respect to the property owned in common;
 

 (4) An heir or legatee of the deceased; or
 

 (5) A mortgage creditor or holder of a vendor's privilege, with respect to property subject to the mortgage or privilege.
 

 [24]
 

 . The committee observed that respondent is "[ujnder significant stress due to family issues,” but it did not elaborate further.
 

 [25]
 

 . Standard 4.31 provides that disbarment is generally appropriate when a lawyer, without the informed consent of his client, engages in the representation of the client knowing that the lawyer's interests are adverse to the client's with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client.